Keith L. PRESCOTT, Plaintiff,

v.

UNITED STATES of America and Reynolds Electrical and Engineering Company, Inc., a Nevada Corporation, Defendants.

No. Civil LV 80–143 RDF.

United States District Court,
D. Nevada.

Sept. 9, 1981.

920

Johns & Johns, Alan R. Johns and Larry Johns, Las Vegas, Nev., Stewart L. Udall, Phoenix, Ariz., Haralson, Kinerk & Morey by D. Dale Haralson, Tucson, Ariz., for plaintiff.

B. Mahlon Brown, U. S. Atty., Brian L. Sullivan, Asst. U. S. Atty., Las Vegas, Nev., Bruce E. Titus, Asst. Director, Torts Branch Civil Division, Mark S. Landman, Trial Atty., Torts Branch Civil Division, U. S. Dept. of Justice, Washington, D. C., for defendant United States.

John L. Thorndal of Thorndal, Backus, Lyles & Maupin, Ltd., Las Vegas, Nev., for defendant Reynolds Electrical, etc.

## DECISION ON MOTIONS

ROGER D. FOLEY, District Judge.

Plaintiff Keith L. Prescott alleges that he is a resident of Utah and is suffering from multiple myeloma, a permanently disabling disease causing rapid and advanced aging. He claims that he contracted the disease as a result of exposure to radiation while he was employed at the Nevada Test Site between 1961 and 1968. He claims that the disease was not medically diagnosed until 1969, that he was permanently disabled by then, and that it was not until early 1979 that he began to suspect a causal connec-tion between exposure at the Test Site and his multiple myeloma.

The complaint, filed May 14, 1980, is brought against the United States under the Federal Tort Claims Act (FTCA), Title 28 U.S.C. § 1346(b), and against Reynolds Electrical and Engineering Company, Inc. (REECo) on the grounds of diversity of citizenship under Title 28 U.S.C. § 1332.

REECo filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6), Federal Rules of Civil Procedure, and a motion for summary judgment under Rule 56(b). REECo argues that this Court lacks subject matter juris-diction over this action because there is no diversity of citizenship; that this action is barred in that plaintiff's exclusive remedy is either under the Nevada Industrial Insur-ance Act (NIIA), Nevada Revised Statutes Chapter 616, or the Nevada Occupational Disease Act (NODA), Nevada Revised Stat-utes Chapter 617; that plaintiff's claim is time-barred pursuant to NRS 11.190(4)(e).

The United States has also filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), FRCP, or, in the alternative, for summary judgment pursuant to Rule 56(b), FRCP. The Government asserts the "statu-tory employee-employer" defense, contend-ing that plaintiff's exclusive remedy under Nevada's compensation law bars this action against the United States. The Govern-ment makes three arguments as to why it is immune to suit. First, it claims that it is shielded from third-party tort liability as the "statutory employer" of plaintiff. Second, the Government asserts that it vol-untarily elected to participate in the Neva-da workman's compensation scheme. And third, the Government claims that it is a self-insurer as authorized by particular sec-tions of the compensation statutes.

Oral argument was heard on these mo-tions and on similar motions in the compan-ion cases on May 18, 1981.

## STATEMENT OF FACTS

Since the early 1950's the United States, acting through several of its departments

and agencies,[1] has been actively participating in virtually all phases of nuclear testing at the Nevada Test Site. The testing of nuclear devices and weapons has been conducted both above and below ground. Although much of the work at the Test Site was and is delegated to independent contractors, such as REECo and EG&G Inc., all such testing was and is strictly supervised and controlled by federal officials and employees.[2] REECo was, and still is, a principal contractor at the Test Site.

For the period January 1, 1960, through December 31, 1968, during which plaintiff was employed by REECo as an operating engineer at the Test Site, there was in effect a contract between the United States, acting through the AEC and REECo, designated AT (29–2)–162. A new contract between the same parties became effective January 1, 1969, for the period January 1, 1969, through December 31, 1973, inclusive, designated as Contract AT (26–1)–410.

In conformity with 41 CFR §§ 1–10.502–1 and 9–50.1212, both contracts mentioned above required that REECo purchase and maintain in full force and effect workman's compensation insurance for its employees as required by the Nevada Industrial Insurance Act and the Nevada Occupational Disease Act. Those regulations also required that the costs of the insurance be passed on to the Government.

Since 1952 REECo has maintained workman's compensation insurance pursuant to the Nevada Industrial Insurance Act and the Nevada Occupational Disease Act. (See the Worker's Compensation Insurance Certificate attached to REECo's motion papers herein.) As REECo is paid by the Government on a cost-plus-fixed-fee basis, REECo passed the cost of its workman's compensation insurance on to the Government and those costs were in fact paid by the United States.

Between the years 1961 through 1968, plaintiff was an employee of REECo at the Nevada Test Site working in the capacity of an operating engineer. During the course of his employment, plaintiff was exposed to radiation when he was sent into test areas immediately after nuclear detonations. In 1969 plaintiff was diagnosed as having multiple myeloma, and by then he was permanently disabled. Plaintiff contends that it was not until early 1979 that he began to suspect a causal connection between his exposures to radiation while working at the Test Site and his multiple myeloma. At that time there was considerable public attention being given to the "Three Mile Island" incident, as well as the so-called "Baneberry Trial" in this court concerning other Test Site workers' exposure to radiation. *Roberts and Nunamaker v. United States, et al.,* Civ. LV 1766 RDF and Civ. LV 76–259 RDF. Plaintiff contacted private counsel who, in turn, advised him to obtain his dosimetry history and medical records. After counsel reviewed those items, plaintiff was advised by his counsel, on April 16, 1979, that in counsel's opinion plaintiff's exposure history might be causally connected to his multiple myeloma.

Plaintiff filed a claim with the Department of Energy (DOE) under Title 28 U.S.C. § 2675. No action was taken on his claim. Plaintiff filed the complaint herein on May 14, 1980. Plaintiff claims that his dosimetry history reveals rather substantial gamma and tritium readings for the years 1961–63 and that those early exposures initiated his disease causing permanent disability which was not diagnosed until 1969.

---

1. The Atomic Energy Commission (AEC), which was abolished effective January 19, 1975, by the Energy Reorganization Act of 1974, Title 42 U.S.C. §§ 5801–91, was replaced by the Energy Research and Development Administration (ERDA). The Department of Energy Organization Act of 1977, Title 42 U.S.C. § 7101 et seq., transferred the functions of ERDA to the Department of Energy (DOE). See Title 42 U.S.C. § 7151.

2. For a full overview, see the testimony of General Mahlon Gates, Manager, Nevada Operations Office, Department of Energy, on March 8, 1979, in this court in *Roberts and Nunamaker v. United States,* Civil LV 1766 RDF, and Civil LV 76–259 RDF, TR pp. 4159–4226, inclusive. Such testimony has been stipulated to be admissible in this case and the companion case of *Reagan v. United States,* Civil LV 78–123 RDF.

## I.

### A. *The Nevada Occupational Disease Act.*

In determining whether or not plaintiff has an exclusive remedy under either the Nevada Industrial Insurance Act (NIIA) or the Nevada Occupational Disease Act (NODA), the Court must decide whether plaintiff's multiple myeloma as allegedly contracted in this case was an "accident" under NIIA, or an "occupational disease" under NODA.

In 1944, the Nevada Supreme Court held in *Pershing Quicksilver Co. v. Thiers,* 62 Nev. 382, 152 P.2d 432 (1944), that the then-existing NIIA did not provide coverage for any occupational diseases. That decision was based upon the difference between an "accident" and a "disease." The Court said, "The illness suffered by respondent cannot, from the evidence presented, be said to be assignable to a determinate or single act identified in space or time, but the substance was entering his body during the entire course of his employment." 62 Nev. at 394, 152 P.2d 438. Since NIIA covered only personal injuries sustained "by accident," the respondent's mercury poisoning did not fall within NIIA's scope, and he was able to sue his employer at common law even though the employer had NIIA coverage.

The term "accident" is defined in NRS § 616.020 as being "an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and providing at the time objective symptoms of an injury." This definition was given by the Nevada Supreme Court in the *Pershing Quicksilver* opinion. In that case, the Court also said, "The term 'accident' as it refers to a cause of injury must be traced to an unexpected event and to a definite time, place and cause." 62 Nev. at 393, 152 P.2d at 437.

In contrast, NRS § 617.450 provides in pertinent part that: "Radium poisoning or disability due to radioactive properties or substances, . . . . . or to exposure to ionizing radiation shall be considered an occupational disease and compensable as such when contracted by an employee and when arising out of and in the course of employment . . . . ." NRS 617.440 then provides when such an occupational disease shall be deemed to arise out of and in the course of the employment.

■ Plaintiff alleges that he was ordered into highly contaminated areas immediately after nuclear detonations in order to retrieve test instruments. This activity, he claims, was regularly performed by him in the ordinary course of his employment. His claim is that the exposures he received from 1961–63 resulted in his developing multiple myeloma by 1969. Thus, plaintiff's multiple myeloma, as allegedly contracted under the circumstances of this case, must be an occupational disease under NODA, and not the result of an industrial accident under NIIA.

### B. *Legislative History of NODA.*

The next issue that must be resolved is when did NODA become applicable to the facts of this case?

In 1947 Senate Bill No. 4, Chapter 44, 1947 Statutes of Nevada, the Nevada Legislature first enacted NODA. Section 26(b) of the original act, now NRS § 617.450, defined "occupational diseases" subject to NODA as follows:

"(b) Only the following diseases shall be considered occupational diseases and compensable as such, when contracted by an employee arising out of and in the course of the employment in any process described herein."

A schedule of twenty-three specific diseases and processes was then set forth. Item No. 17 on that schedule was the only disease that mentioned radiation. It read:

"17. Radium poisoning . . . . . Any process involving the production or use of radium and other radio active substances, in luminous paint."

Thus, the original NODA included only radiation diseases contracted from the use of luminous paint. Furthermore, before any of the specifically defined occupational diseases could be compensable under

NODA, they had to be deemed to "arise out of and in the course of the employment" under § 26(a), now NRS § 617.440. That original section read:

> "Sec. 26. (a) The occupational diseases hereinafter defined shall be deemed to arise out of and in the course of the employment, only when such disease was contracted within twelve (12) months previous to the date of the disablement, and if there is a direct causal connection between the conditions under which the work is performed and the occupational diseases, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment, and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workmen would have been equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not have been foreseen or expected, but after its contraction must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a natural consequence."

In 1949 Nevada Assembly Bill No. 28, Chapter 177, 1949 Statutes of Nevada, the next legislature amended § 26(b) by changing its language as follows:

> "(b) [Only] The following diseases *as well as all other occupational diseases defined in subdivision (a) of this section* shall be considered occupational diseases and *shall be* compensable as such, when contracted by an employee *and when* arising out of and in the course of the employment in any process described herein." (Emphasis provided.)

At first blush this amendment seems to remove the exclusiveness of the original schedule of occupational diseases covered by NODA. However, the last phrase, "when arising out of and in the course of the employment in any process described here-in," still limited "occupational diseases" to those diseases arising out of the processes described in the schedule of diseases and processes in § 26(b). Item No. 17, Radium Poisoning, remained unchanged. Thus, the 1949 amendment did not expand NODA's coverage in any pertinent manner.

There were no pertinent changes in NODA until 1961. In that year the Nevada Legislature passed Assembly Bill No. 124, Chapter 308, 1961 Statutes of Nevada, which was entitled:

> "AN ACT to amend NRS sections 617.440 and 617.450, relating to occupational diseases, by providing that radiation injuries shall be considered occupational diseases; by providing that such occupational diseases shall be deemed to arise out of and in the course of employment only when they are contracted within 4 years previous to the date of disablement; and by providing other matters properly relating thereto."

Chapter 308 amended the definition of "occupational diseases" to include:

> "Radium poisoning *or disability due to radioactive properties or substances, or to roentgen rays (X-rays), or to exposure to ionizing radiation* . . . . . . . . . . . . Any process involving the [production or] use of [radium and other radioactive substances, in luminous paint] *or direct contact with radium or a radioactive substance, or the use of or direct exposure to roentgen rays (X-rays) or ionizing radiation.*"
> (Emphasis provided.)

However, Chapter 308 then limited the situations in which a radiation-induced occupational disease would be deemed to arise out of and in the course of the employment so as to be compensable under NODA. Those situations were:

> "*cases of disability resulting from radium poisoning or exposure to radioactive properties or substances, or to roentgen rays*

*(X-rays) or ionizing radiation, in which cases the poisoning or illness resulting in disability must have been contracted in the State of Nevada within 4 years prior to the date on which such disability occurred, while the claimant was covered by the provisions of this chapter and not while the claimant was an employee of the Atomic Energy Commission of the United States or any of its contractors or subcontractors."* (Emphasis provided.)

Thus, under the 1961 amendments in Chapter 308, radiation-induced diseases were not "occupational diseases" covered by NODA if:

(1) the latency period between contraction and disability exceeded four years; *or*

(2) the diseased worker was an employee of the AEC or its contractors or subcontractors.

If either of those two situations existed, then there was a right to sue at common law.

In 1963 Nevada Assembly Bill No. 474, Chapter 388, 1963 Statutes of Nevada, removed the exclusion for employees of the AEC or any of its contractors or subcontractors. However, the four-year latency period for radiation diseases was retained.

In 1967 Nevada Senate Bill No. 147, Chapter 220, 1967 Statutes of Nevada, removed the four-year latency period. Since that amendment, the definition of a radiation-induced "occupational disease" covered by NODA has remained unchanged. That definition is now contained in NRS §§ 617.-450 and 617.440 which read in pertinent part:

"617.450 Specific occupational diseases; schedule. The following diseases, as well as other occupational diseases defined in NRS 617.440, shall be considered occupational diseases and shall be compensable as such when contracted by an employee and when arising out of and in the course of the employment in any process described in this section.

SCHEDULE

| Description of Disease or Injury | Description of Process |
| --- | --- |
| Radium poisoning or disability due to radioactive properties or substances, or to roentgen rays (X-rays), or to exposure to ionizing radiation . . . . . . . . . . | Any process involving the use of or direct contact with radium or a radioactive substance, or the use of or direct exposure to roentgen rays (X-rays) or ionizing radiation." |

"617.440 Occupational disease arising in course of employment: Necessary requirements.

"1. An occupational disease defined in this chapter shall be deemed to arise out of and in the course of the employment:

(a) Only when the disease was contracted within 12 months previous to the date of disablement, except in cases of disability resulting from radium poisoning or exposure to radioactive properties or substances, or to roentgen rays (X-rays) or ionizing radiation, in which cases the poisoning or illness resulting in disability must have been contracted in the State of Nevada.

(b) If there is a direct causal connection between the conditions under which the work is performed and the occupational disease;

(c) Which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

(d) Which can be fairly traced to the employment as the proximate cause; and

(e) Which does not come from a hazard to which workmen would have been equally exposed outside of the employment.

"2. The disease must be incidental to the character of the business and not independent of the relation of employer and employee.

"3. The disease need not have been foreseen or expected, but after its contraction must appear to have had its origin in a risk connected with the employ-

ment, and to have flowed from that source as a natural consequence."

Therefore, it is the NODA statute as finally amended in 1967 that is applicable to this case.

### C. *The "Vested Rights" Theory.*

Plaintiff argues that he has a right to sue at common law because workers in his situation were excluded from NODA coverage during 1961–63, the time when he claims he contracted his disease. He asserts that to apply NODA as it was finally amended in 1967 would deprive him of that "vested right" and would constitute a species of unconstitutional retroactive legislation.

■ The above history of NODA shows that, as an employee of a contractor of AEC, plaintiff was not covered by NODA between 1961 and 1963. Between 1963 and 1967, he would have been covered only if his disease was contracted in Nevada within four years of the date of disablement. The exact date of disablement is not known except that by the time the disease was diagnosed in 1969, plaintiff was permanently disabled. Thus, it is true that plaintiff was not covered by NODA when he alleges he contracted his multiple myeloma. However, NODA as finally amended in 1967 is still applicable to plaintiff's case. His argument that this constitutes a species of unconstitutional retroactive legislation is faulty.

■ The "vested rights" theory is a general rule of law to the effect that the law in force at the time of an injury or accident governs the right to, or liability for, compensation, and that compensation acts or amendments thereto are not applicable to injuries sustained before their enactment or effective dates. See, e. g., *Frick v. Nevada Industrial Comm'n,* 95 Nev. 263, 592 P.2d 948 (1979); *Milliken v. Sloat,* 1 Nev. 573 (1865). The Nevada Attorney General Opinion cited by plaintiff, # 54 July 27, 1921, as well as the *Frick* decision, merely applied this general rule to an injured employee who was already receiving compensation and who requested an increase pursuant to a subsequent amendment to NIIA. That situation is fundamentally different from the facts as alleged by plaintiff.

■ There is a well-settled exception to the "vested rights" general rule. The exception deals with situations in which the actual disability occurs after the date of the accident. In such circumstances, the law in effect at the date of the occurrence of the disability governs, and not the law at the date of the accident. See, e. g., *Allen v. Kalamazoo Paraffine Co.,* 312 Mich. 575, 20 N.W.2d 731 (1945); *Bemis v. Texaco, Inc.,* 400 P.2d 529, reh. denied, 401 P.2d 708 (Wyo.1965); *Peters v. Chrysler Corp.,* 295 A.2d 702 (Del.1972). The rationale behind this exception to the general rule is that an employee's rights do not vest until his cause of action has accrued, and a cause of action accrues when litigation could first be successfully maintained. Since a disability action cannot succeed until the disability occurs, the action cannot accrue before the time of disability.

This rationale has been applied to occupational disease cases. See, e. g., *Tucker v. Claimants in Death of Gonzales,* Colo.App., 546 P.2d 1271 (1976); *Romero v. Standard Metals Corp.,* 37 Colo.App. 252, 485 P.2d 927 (1971); *Schubert v. Peerless Products, Inc.,* 223 Kan. 288, 573 P.2d 1009 (1978). In the *Tucker* case, the employee had been employed by Tucker as a uranium miner from March 1957 to October 1958. He then became a construction worker until his death in 1966. His death was later diagnosed as having been the consequence of lung cancer, and his dependents filed a claim for death benefits with the Colorado Industrial Commission for death benefits. They alleged that the fatal carcinoma had been contracted as a result of exposure to radioactivity during the employee's work as a miner for Tucker. The Commission adopted the referee's order granting the benefits.

The law in effect at the time of the exposure barred the claim; however, the act had been amended after the employee had left Tucker's employment. The Colorado Court upheld the award of benefits as provided in the amended version of the act. The Court said in pertinent part:

"Under the Colorado Occupational Disease Disability Act, rights accrue neither at the time of exposure nor at the time the disease is contracted, but only at the time that disability occurs.... The possible liability for compensable occupational disease, which must be contemplated by the employer at the formation of the employment relationship, is merely a potential cause of action until disability or death cause it to mature into an enforceable claim....

"[T]he law which governs the rights and liabilities of the parties is that in force at the time of the disability and death ... and the application of the law then in effect does not involve a retroactive application of that law." 546 P.2d at 1274–75 (citations omitted). See also *Gleason v. United States*, 458 F.2d 171, 174 (3rd Cir. 1972).

NODA is identical to the Colorado Occupational Disease Disability Act in that compensation does not flow from the mere contraction of an occupational disease. Instead, compensation under both acts flows from a disablement resulting from such a disease. NRS § 617.060 defines disablement as "the event of becoming physically incapacitated from performing any work for remuneration or profit by reason of an occupational disease, arising out of and in the course of employment."

■ In paragraph V of the complaint, plaintiff states that he was an employee of REECo through 1968. It is his claim that the exposures between 1961 and 1963 caused his permanent disability by 1969. Thus, his cause of action could not have accrued until after the 1967 amendments brought him under NODA's coverage. The result is that NODA's application to plaintiff's claim does not cause any deprivation of rights which had accrued at the time of its final amendment in 1967. Thus, application of NODA to the particular fact situation presented in this case does not constitute an impermissible retroactive application of NODA. A statute is not rendered retroactive merely because the facts upon which its subsequent action depends are drawn from a time antecedent to its enactment. *Reynolds v. United States*, 292 U.S. 443, 54 S.Ct. 800, 78 L.Ed. 1353 (1934); *Benjamin v. Hunter*, 176 F.2d 269 (10th Cir. 1949). The result would be to the contrary if plaintiff's cause of action had accrued before the 1967 amendment to NODA.

D. *Intentional Tort Theory.*

■ Plaintiff argues that REECo willfully and intentionally sent him into test areas immediately after nuclear detonations and that this constituted an intentional tort that is outside NODA's coverage. His contention is that Nevada law is unsettled on the question of whether an intentional tort is beyond the exclusiveness of the state's compensation statutes. Therefore, he argues that Nevada would adopt the Utah court's decision in *Bryan v. Utah International*, 533 P.2d 892 (Utah 1975), and allow him to bring this action outside NODA. This argument is faulty for several reasons.

First, *Bryan* is not all that helpful to plaintiff because it is so clearly distinguishable from the case at bar. In *Bryan*, an employee sued a fellow employee and their employer for injuries he sustained when the fellow employee intentionally, and with malice aforethought, started a pickup truck and drove it, thereby jerking a cable against Bryan so as to injure him. Section 35–1–60 of the Utah Workmen's Compensation Act provided:

"no action at law may be maintained against an employer or against any officer, agent or employee of the employer based upon any accident, injury or death of an employee."

The majority opinion concluded that what had happened was not "an accident" and decided that the public policy in Utah allowed a person injured through the intentional act of another to seek redress from the one intending harm. Thus, the injured employee was allowed to sue the fellow employee who had intentionally injured him. However, the employer was immune from suit because there was no allegation that it intended the injury, and no such showing was made by merely having in-

formed various supervisors about the fellow employee's intended battery. Interestingly, the dissent also would have shielded the fellow employee because of the clear statutory language.

In the case at bar, plaintiff has alleged that REECo was aware of the potential hazards to plaintiff, but that it willfully continued to send him into areas of high radiation exposure. The "intent" in *Bryan* that allowed that action to proceed outside the compensation scheme, was the fellow employee's intent to commit a battery against the injured employee. Although plaintiff alleges in paragraph 12 of his complaint that he "received exposures as anticipated of a dangerous level," nowhere does he allege that REECo intended that he contract any disease or suffer any injury. The alleged "willful intent" of REECo sending workmen into immediate areas of nuclear detonations in order to perform their jobs is not the same as an intent to make those workmen sick. Thus, even under *Bryan*, REECo would be immune from suit.

Furthermore, it appears that Nevada would probably not apply the *Bryan* principle to the allegations of this case. In *Kennecott Copper Corp. v. Reyes*, 75 Nev. 212, 337 P.2d 624 (1959), a deceased employee's parents sued the employer, who was covered by NIIA, for wrongful death. Their son had been killed in a slide in one of the employer's open pit mining operations. There was evidence that the employer had foreseen and expected that at some time in the future a slide would occur, and the Court so assumed. The complaint alleged that the employer's actions in ordering the employee to continue his work below the threatened slide, without any warning to him, and without taking any steps for his safety constituted reckless, willful and wanton misconduct. Thus, the parents argued that the occurrence causing their son's death was not an "accident" and therefore not within the purview of NIIA.

The Nevada Supreme Court rejected that argument and held that any injury to an employee arising out of and in the scope of his employment is covered by NIIA. In reaching its decision, the Court said:

"It is not contended that appellant had any deliberate intent to kill or injure the decedent, or any other employees of appellant. . . . If the occurrence was an accident as defined, compensation under the act would follow whether the event was 'with or without human fault.'

"Nothing in the statutory definition of an accident and nothing elsewhere in the act indicates an exclusion from its compensatory provisions of any accident by reason of any varying of the employer's degree of fault." 75 Nev. at 215, 337 P.2d at 626.

Because of the similarity between NIIA and NODA, this Court believes that the Nevada Court would apply the *Kennecott* decision to occupational disease cases and hold that any disease contracted by an employee arising out of and in the scope of his employment is covered by NODA. Since there is no significant distinction between the argument rejected in *Kennecott* and plaintiff's argument in this action, this Court holds that plaintiff's allegations do not take his claim outside NODA's coverage. Indeed, under plaintiff's theory NODA would become meaningless because in every occupational disease case, the employer must "intentionally" require the employee to do whatever activity it is that the occupational disease results from. The Nevada Legislature could not have intended such a result.

II.

THE UNITED STATES' MOTIONS TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

As stated, plaintiff bases his complaint as against the United States upon the Federal Tort Claims Act, Title 28 U.S.C. §§ 1346(b) and 2674. He alleges that Government employees were negligent in the conduct of the underground nuclear testing which resulted in the high levels of radiation which he claims caused his multiple myeloma.

As previously mentioned, the Government has moved this Court to dismiss the

action as against the United States pursuant to Rules 12(b)(1) and (6) on the grounds that this Court lacks subject matter jurisdiction and that the complaint fails to state a claim upon which relief can be granted. In the alternative, the Government · has moved for summary judgment under Rule 56(b) on the grounds that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. The Government's contention is that plaintiff's remedy under NODA is exclusive as to the Government. The Government argues that it was a "principal contractor" and that plaintiff was its "statutory employee" so that the Government is shielded from third-party liability under NODA and Nevada case law. In the alternative, the Government argues that it voluntarily elected to participate in NODA and that it is a self-insurer under a particular section of NODA.

## A. *The Federal Torts Claim Act.*

Whenever the United States is sued, the relevant inquiry is whether federal law permits such a suit. *Bramer v. United States,* 595 F.2d 1141, 1144 n.7 (9th Cir. 1979). It is a cornerstone of our legal and governmental system that the sovereign cannot be sued without its consent. The FTCA is a limited waiver of the Federal Government's sovereign immunity. It grants a limited consent to suit in § 2674 which states in pertinent part:

"The United States shall be liable, respecting the provisions of this title relating to tort's claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

Section 1346(b) gives exclusive jurisdiction to the district courts:

"of civil actions on claims against the United States, for money damages ... for ... personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

These statutes make the United States liable for federal officers and employees' negligence in performing their duties if the applicable state law would impose liability on private persons or corporations under similar circumstances. The test for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the state where the acts occurred. *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Rayonier Inc: v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957); *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Where the Government activity was not one ordinarily entered into by a private individual, the question is whether under state law a private person doing what the Government was doing could be sued for negligence. *Big Head v. United States,* 166 F.Supp. 510 (D.Mont.1958). Thus, the fact that nuclear testing is at the heart of this action does not give rise to any different application of the FTCA. As stated in *Bulloch v. United States,* 133 F.Supp. 885 (D.Utah 1955):

"Under the Tort Claims Act permitting recovery against the United States if a private person would be liable, it is not necessary to show that a private person could be sued under identical circumstances..... It is pointed out that private persons under existing law cannot legally detonate a nuclear device. Neither can they maintain armies, operate the postal service, operate, independent of Government, certain secret experimental aircraft, or operate military airbases. Yet, there are analogous private activities in the scope of which certain negligent acts would give rise to private liability. [There is] no doubt that as to these, there may be corresponding responsibility on the part of the Government under the Tort Claims Act, depending upon the particular facts.... [T]o hold the Government responsible for certain acts or omis-

sions occurring in the course of nuclear tests would not necessarily visit the Government with 'novel or unprecedented liabilities' contrary to the intent of Congress." 133 F.Supp. at 892 (citations omitted).

## B. *State Workmen's Compensation Laws and Federal Projects.*

■ This Court turns to the inquiry of whether or not the Government may assert a defense based on state workmen's compensation laws in an action arising out of a federal project conducted on federal property. The Nevada Test Site is a large area of land in the State of Nevada, northwest of Las Vegas, which has been withdrawn from the public domain for use as an outdoor laboratory for nuclear testing. In *Murray v. Joe Gerrick & Co.,* 291 U.S. 315, 318, 54 S.Ct. 432, 433, 78 L.Ed. 821, 824 (1934), the Supreme Court said that Congress may adopt the provisions of a state workmen's compensation act so as to make it applicable to injuries occurring on federal property within the boundaries of a state. Two years later, Congress enacted Title 40 U.S.C. § 290 which provides that the constituted authority in each state charged with the enforcement of that state's workmen's compensation laws:

> "shall have the power and authority to apply such laws to all lands and premises owned or held by the United States of America ... which is within the exterior boundaries of any State, and to all projects, buildings, constructions, improvements, and property belonging to the United States of America, which is within the exterior boundaries of any State, in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State within whose exterior boundaries such place may be."

By its very language, Section 290 operates of its own force without action on the part of any state legislature. *Capetola v. Barclay White Co.,* 139 F.2d 556 (3rd Cir. 1943), cert. denied, 321 U.S. 799, 64 S.Ct. 939, 88 L.Ed. 1087. It did not adopt state compensation laws as federal law applicable to federal territories within the states. Rather, its purpose and effect was to free state workmen's compensation laws from the restraint upon their enforcement that otherwise would have existed by reason of the exclusive federal jurisdiction over federal lands within the states. Upon its enactment, state compensation laws became operable as to injuries received by employees of private employers on federal property within a state's exterior boundaries. Id. at 559. See also *Stacey v. United States,* 270 F.Supp. 71, 75 (E.D.La.1967).

## C. *The "Statutory Employee-Employer" Relationship.*

What is the "statutory employee-employer" relationship and how does it operate?

Many state compensation statutes contain provisions under which a person may be deemed to be the employer of another person when the first person is not in fact the employer of the second. Other states, including Nevada, have statutes under which a person may be deemed to be the employee of another person when that other person is not in fact his employer. The first type is a "statutory employer" statute, while the second is a "statutory employee" statute.

■ Any statute creating a "statutory employee-employer" relationship has two divergent purposes. First, such statutes guarantee that an injured employee will receive his statutory compensation without being forced into litigation. Such legislation protects employees of irresponsible and uninsured subcontractors by imposing ultimate liability on the presumably responsible principal contractor, who has it within his power, in choosing subcontractors, to pass upon their responsibility and insist upon appropriate compensation protection for their workers. This is the compensatory rationale of such legislation. Where there is a hierarchy of principal contractors upon subcontractors upon sub-subcontractors, if an employee of the lowest tier subcontractor is injured, there is no practical reason for reaching up the hierarchy any farther than the first insured contractor. The full

purpose of the compensation act will have been secured when that contractor's insurer pays the injured employee. See 1C Larson, *Workmen's Compensation* § 49.11, pp. 9–12 to 9–13 (1976).

The "statutory employee-employer" relationship has both offensive and defensive applications. The decision of this Court in *Barker v. Luna*, 439 F.Supp. 810 (D.Nev. 1977, Thompson, J.), is an example of the offensive application of the relationship to establish common law liability against the Government when its contractors fail to comply with state workman's compensation statutes.

The second purpose of "statutory employee-employer" legislation provides a category of persons immune from third-party suit. The theory behind third-party actions is the moral idea that the ultimate loss from wrongdoing should fall upon the actual wrongdoer. Determination as to who is a "third party" amenable to common-law suit is made by examination of the particular statutory scheme involved. Since the principal contractor is, in effect, made the employer for the compensatory purposes of such legislation, it is obvious that he should also enjoy the regular immunity of an employer from third-party suit when the facts are such that he could be made liable for compensation. When there is a hierarchy of subcontractors and sub-subcontractors, immunity has generally been extended up the hierarchy above the first insured employer. 2A Larson, *Workmen's Compensation*, §§ 72.00 and 72.31 (1976).

Whether or not the Federal Government may assert a "statutory employee-employer" relationship defensively has resulted in a split of authority among the federal courts. Resolution of this question has turned upon the language of the particular state workman's compensation statutes involved. Compare: *Roelofs v. United States*, 501 F.2d 87 (5th Cir. 1974), cert. denied, 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47; *Watkins v. United States*, 479 F.Supp. 785 (D.S.C.1979); *Stacey v. United States*, 270 F.Supp. 71 (E.D.La.1967), with: *Richardson v. United States*, 577 F.2d 133 (10th Cir. 1978); *Kirk v. United States*, 232 F.2d 763 (9th Cir. 1956); *Whitney v. United States*, 451 F.Supp. 669 (N.D.Fla.1978), and *Griffin v. United States*, 644 F.2d 846 (10th Cir. 1981).

In two recent cases, this Court has held that the Federal Government could assert the "statutory employee-employer" relationship provided for under NIIA as a complete defense to third-party claims brought under FTCA. See *Snow v. United States*, 479 F.Supp. 936 (D.Nev.1979, Claiborne, J.), appeal pending, No. 80–5091 (9th Cir.); *Lewis v. United States*, 501 F.Supp. 39 (D.Nev.1980, Reed, J.), appeal pending, No. 80–4515 (9th Cir.). In both of those decisions, this Court looked to the Nevada Supreme Court decisions interpreting the applicable NIIA provisions. It then determined that the Government had retained sufficient control over the work of the direct employers and their employees so that the Government was deemed to be the "principal contractor" under NRS § 616.085. Consequently, the injured employees were the "statutory employees" of the Government and, as such, were limited to the exclusive remedies provided for under NIIA.

However, as previously shown, NODA is applicable to this action instead of NIIA. These statutory schemes are identical in many of their provisions, and two of those areas of similarity are pertinent to this case. It should be noted that REECo's relationship to the Federal Government at the Nevada Test Site is well settled as being that of an independent contractor. See *Wimberly, et al. v. Reynolds Electrical Engineering Co.*, et al., Civ. 609 (D.Nev.1966); *McGarry v. United States*, 370 F.Supp. 525, 529 (D.Nev.1973); *Snow v. United States*, 479 F.Supp. 936, 937–38 (D.Nev.1979).

The first pertinent area of similarity between NIIA and NODA is in their identical definitions of subcontractors. NRS § 616.115 (NIIA) and NRS § 617.150 (NODA) state " 'subcontractors' shall include independent contractors." These provisions treating independent contractors as subcontractors are unique to the Nevada compen-

sation laws. See *Aragonez v. Taylor Steel Co.*, 85 Nev. 718, 720, 462 P.2d 754, 755–56 (1969).

The second pertinent area of similarity between NIIA and NODA concerns their "statutory employee" provisions. Prior to 1951, those provisions were identical. At that time NRS § 616.085 (NIIA) and NRS § 617.100 (NODA) read:

"Subcontractors and their employees shall be deemed to be employees of the principal contractor *or other person having the work done.*" (Emphasis added.)

However, in 1951 the Nevada Legislature deleted the phrase "or other person having the work done" from the NIIA but not from NODA. Specifically noting the significance of that amendment, the Nevada Supreme Court, in the first Nevada decision after the amendment to address the issue of whether an owner can be a "principal contractor" for purposes of § 616.085, stated:

"The owner may indeed be said to be the person who 'has the work done' but, under the [NIIA] ... the liabilities and exemptions were intended to attach to employers of labor and not simply to owners of property as such. Accordingly, as we interpret the intention of the 1951 amendment, it did eliminate an owner whose only status was as owner, but who might be said, as such owner, to be the person having the work done. When the owner assumed the additional status, ... of being principal employer or principal contractor he was not eliminated (from Industrial Insurance Act) because he was also the owner."

*Simon Service, Inc. v. Mitchell*, 73 Nev. 9, 15, 307 P.2d 110, 113 (1957). Thus, the 1951 amendment to NRS § 616.085 removed the inactive owner from the protection of NIIA.

 Since that amendment did not affect NODA, it follows that § 617.100 means exactly what it says. That is, an employee who contracts an occupational disease is the "statutory employee" of the owner who has the work done. Clearly, it was the Federal Government acting through its agency, the Atomic Energy Commission, which was the

owner "having the work done." Thus, plaintiff comes squarely within the "statutory employee" provision of NODA at NRS § 617.100, regardless of whether the same result would obtain under the parallel NIIA provision at NRS § 616.085. However, because of the direct control the United States exercises over the testing of nuclear devices and weapons, it seems clear that even if this case arose under and concerned NIIA, rather than NODA, the United States, not a mere inactive owner, would be held to be the "principal employer," and plaintiff its "statutory employee."

D. *The Kirk Decision.*

 Plaintiff has raised another argument that needs to be addressed. He claims that certain language in the Ninth Circuit's decision in *Kirk v. United States*, 232 F.2d 763 (9th Cir. 1956), precludes the Government from asserting the "statutory employee-employer" relationship defensively. In that case, the Court said, in pertinent part:

"Perhaps the most conclusive reason why the United States is not actually 'an employer' within the meaning of the Idaho act is that there is no provision therein which would define it as such." 232 F.2d at 767.

Plaintiff attaches great importance to that statement, and he points out that the Nevada statutes likewise do not specifically list the United States as an employer. See NRS §§ 616.090 and 617.110. He argues that any workman's compensation statute which does not specifically extend "employer" status to the Government cannot be interpreted as allowing the Government to assert that it is a "statutory employer." This argument is without merit in this case for several reasons.

First, it must be noted that the Idaho statute involved in *Kirk* contained some provisions that were pertinent in that case but which are not contained in the Nevada statutes. See *Barker v. Luna*, 439 F.Supp. 810, 812–13 (D.Nev.1977). More important, NRS § 617.100 is a "statutory employee" statute. Thus, the inquiry under it is

whether or not a diseased employee shall be deemed to be an employee of the Government as the person having the work done. It does not attempt to define the Government as an "employer." Also, there is no indication that NRS § 617.110, which specifically defines certain "employers," was intended to be exclusive. Indeed, the Nevada court, in interpreting NRS § 616.085, the parallel NIIA statute, has adopted a policy of broad and liberal interpretation, recognizing that compensation statutes should operate not only for the benefit of workers, but also for the protection of employers against common law tort actions. See generally *Jackson v. Southern Pacific Co.*, 285 F.Supp. 388 (D.Nev.1968, Thompson, J.).

Finally, this Court notes that there is language by the Ninth Circuit in its recent decision in *Bramer v. United States*, 595 F.2d 1141 (9th Cir. 1979), which indicates a retreat from the *Kirk* language cited by plaintiff. In *Bramer*, a visitor to the Los Alamos Scientific Laboratories in New Mexico brought an FTCA action against the AEC for his alleged injuries that occurred when equipment owned by the Government failed and he inhaled radioactive plutonium. The Ninth Circuit ultimately found that New Mexico law would not impose a nondelegable duty of care upon the AEC. The language in *Bramer* pertinent to this case is as follows:

> "The government pays the premium for Bramer's Workmen's Compensation coverage just as it pays the premium for employees of the University. Thus, the government does not 'escape liability.' Here too, there seems no valid reason why we should not apply the second rationale, which 'indicates [that] an employer's liability to employees of independent contractors should not be greater than the employer's liability to his own employees.'" 595 F.2d at 1145–46 (citations omitted).

Thus, this Court is convinced that the *Kirk* decision does not prevent the "statutory employee-employer" relationship from being applied to this case. However, as previously discussed, such a relationship may have either offensive or defensive applications.

### III.

#### A. *The AEC–NIC Contract.*

As set forth in the statement of facts, supra, the pertinent AEC–REECo contracts and Federal Regulations required REECo to purchase and to maintain in full force and effect workman's compensation insurance for its employees as required by NIIA and NODA. The statement of facts also recites that REECo has maintained such workman's compensation insurance under NIIA and NODA, and the costs of the same to REECo were passed on to and paid for by the Government.

On June 26, 1956, the AEC entered into an agreement with the NIC, AT (29–2)–268. This agreement, although extended from time to time by nine different modifications, has not been changed in substance. The last modification, No. 9, is dated March 1, 1974, and has not been terminated to date. Insofar as is pertinent to this case, the agreement between the AEC and NIC has remained the same from 1956 to date. The original agreement reads in pertinent part:

> "WHEREAS, the AEC has heretofore had and will hereafter have contracts and subcontracts involving work in the State of Nevada; and
>
> "WHEREAS, employees working in the performance of such contracts and subcontracts are or will be covered by the Nevada Industrial Insurance Act and the Nevada Occupational Diseases Act; and
>
> "WHEREAS, such employees may incur bodily harm from exposure to radiation from nuclear materials (hereinafter referred to as 'radiation harm'), which may be compensable under the applicable Nevada Act; and
>
> "WHEREAS, all or part of the financial burden of any increase in the premiums which might be required to be paid by AEC contractors and subcontractors under the applicable Nevada Act as a result of the possibility of radiation harm

may ultimately be borne by the AEC; and

"WHEREAS, it is considered desirable that the NIC make use of the knowledge and experience of the AEC in determining the existence, and care and treatment, of radiation harm; and

"WHEREAS, it is considered desirable to limit the AEC's economic burden to the actual expenses incurred and payments made by the NIC under the applicable Nevada Act as a result of radiation harm claimed by such employees and to assure that such employees receive appropriate medical care and treatment for radiation harm.

" . . .

"ARTICLE I—*DEFINITIONS*

" . . .

"B. 'Compensation' shall mean all money payments made by the NIC in accordance with the Nevada Act on account of injuries, disabilities or deaths covered thereby due to exposure to radiation resulting from the AEC's activities in the State of Nevada and shall include such money payments for funeral benefits, medical or accident benefits and injuries or disabilities as are provided for in the Nevada Act.

" . . .

"ARTICLE II—*COVERAGE*

"This agreement shall cover only those cases which are compensable under the Nevada Act when NIC and AEC have mutually agreed that radiation harm has, in fact, been incurred by employees while working in the performance of AEC contracts or subcontracts. Any failure of the parties to agree upon coverage hereunder, shall be resolved as provided in Article VII.

"ARTICLE III—*CLAIMS, MEDICAL TREATMENT AND COMPENSATION*

" . . .

"2. The NIC shall determine whether radiation harm claimed is compensable and the extent of such harm, if any, in accordance with the provisions of the Nevada Act and the rules and regulations of the NIC. The AEC shall, upon request of the NIC, consult with and supply information to the NIC to assist the NIC in making such determinations.

"3. The NIC will, to the maximum extent possible under the Nevada Acts and commensurate with the NIC's authority, rely upon the AEC and its facilities for medical care and treatment of employees who incur or claim radiation harm in cases covered by this agreement.

"4. The AEC shall furnish such care and treatment when requested by the NIC in cases covered by this agreement: Provided, However, That the NIC will arrange and pay for such care and treatment locally in any case when advised by the AEC that adequate care and treatment are locally available in such case.

"5. The AEC shall provide information to the NIC concerning the progress of employees receiving medical treatment and care from the AEC for radiation harm covered by this agreement. The NIC shall keep the AEC advised concerning the progress of employees receiving medical treatment and care from others than the AEC or its contractors.

"6. Where an employee claims two or more compensable injuries or disabilities, one of which is radiation harm covered by this agreement, the NIC and the AEC shall, for the purpose of reimbursement hereunder, determine by mutual agreement the extent, if any, to which such employee's injury or disability resulted from radiation.

"ARTICLE IV—*REIMBURSABLE COSTS*

"1. The AEC shall reimburse the NIC for such compensation and medical benefits paid by the NIC on account of radiation harm covered by this agreement, as the NIC and AEC shall agree is reasonable for such harm under the Nevada Acts. If the parties fail to so agree in any case, the amount of reimbursement in that case shall be as determined as provided in Article VII.

"2. In addition to the compensation and medical benefit payments made by

the NIC which are reimbursable under Section 1 of this Article, the AEC shall also reimburse the NIC for administrative expense incurred by the NIC as a result of claims for radiation harm covered by this agreement.

"3. It is expressly understood that all reimbursements to the NIC by the AEC under this Article shall be subject to the availability of appropriations therefor.

" . . .

"ARTICLE VI—*PREMIUM RATE OR RATES*

"Since under this agreement the AEC has agreed to reimburse the NIC for the expenditures made by the NIC in connection with compensable cases of radiation harm incurred by employees working for AEC contractors and subcontractors, the NIC agrees that in determining the premium rate or rates to be paid under the Nevada Act by such AEC contractors and subcontractors during the term of this agreement or any renewal thereof the NIC shall not take into consideration, or include in its computation or assignment of such premium rate or rates, awards made or administrative or other expenses incurred by the NIC on account of any cases or possible cases of radiation harm which are or will be covered by this agreement.

"ARTICLE VII—*ARBITRATION*

"1. If the parties fail to agree upon any matter requiring mutual agreement under this agreement, the matter shall at the request of either party be submitted for determination by arbitration in a manner agreed to by the parties. If the parties fail to agree upon a manner of arbitration within a reasonable time, such arbitration shall be made by three persons, with one person being selected by each party hereto and the third person being selected by the two persons so selected by the parties. Any decision reached in the arbitration process shall not be deemed to preclude an appeal to a court of appropriate jurisdiction.

"2. Nothing contained in this agreement, including this Article VII, shall be deemed to limit the NIC's normal operation with respect to the determination of compensable claims under the applicable Nevada Act and the compensation to be paid thereunder."

As is apparent from the legislative history of NODA, radiation-caused diseases, the result of exposure to radiation from nuclear materials, were first covered by NODA in 1961. However, the 1961 act exempted employees of the AEC and of its contractors. In 1963, the exclusion of employees of the AEC and of its contractors was removed from NODA. Therefore, the NIC, under its agreement with the AEC, could not in any event have awarded compensation for radiation harm to employees of the AEC or of its contractors from 1956 until the 1963 amendment to NODA became effective. From 1963 to 1967 the NIC might have awarded compensation for radiation harm to such employees under NODA if the latency period between contraction and disability did not exceed four years. After the 1967 amendment, which removed the four-year latency period, the NIC for the first time might have, under NODA, awarded compensation for radiation harm to employees of the AEC contractors like plaintiff whose latency period between contraction and disability exceeded four years.

B. *The Lack of NODA Coverage-REECo.*

REECo was plaintiff's direct employer. As such, it was an "employer" of plaintiff as defined in NRS § 617.110 for purposes of NODA. The copy of the Worker's Compensation Insurance Certificate attached to REECo's motion papers indicates that REECo has been covered by NODA, as well as NIIA, since 1952. Thus, under NRS § 617.270, REECo would be immune from suit if REECo's coverage included radiation-caused diseases. NRS § 617.270 states:

"Rights and remedies conclusive and obligatory on employers and employees.

"1. The rights and remedies provided in this chapter on account of an occupational disease sustained by an employee, arising out of and in the course of the employment, shall be exclusive, except as

otherwise provided in this chapter, of all other rights and remedies of such employee, his personal or legal representative, dependents or next of kin, at common law or otherwise, on account of such disease.

"2. The terms, conditions and provisions of this chapter for the payment of compensation and the amount thereof for such diseases sustained or death resulting from such diseases shall be conclusive, compulsory and obligatory upon both employers and employees coming within the provisions of this chapter."

■ Although there are no Nevada decisions interpreting § 617.270, there is considerable case authority interpreting § 616.370, the corresponding NIIA statute. See, e. g., *Outboard Marine Corp. v. Schupbach*, 93 Nev. 158, 561 P.2d 450 (1977); *Cummings v. United Resort Hotels, Inc.*, 85 Nev. 23, 449 P.2d 245 (1969); *Kennecott Copper Corp. v. Reyes*, 75 Nev. 212, 337 P.2d 624 (1959). The cases interpreting § 616.370 make it abundantly clear that the language "shall be exclusive of all other rights and remedies" means exactly what it says. Since § 617.270(1) and (2) are identical to § 616.370(1) and (2), the cases interpreting the exclusive remedy provisions of NIIA may be applied by analogy to cases construing § 617.270 of NODA. After examining the NIIA cases, it is clear to this Court that if REECo secured NODA coverage for radiation-caused diseases, then plaintiff's exclusive remedy would be under NODA. However, REECo has not had such insurance since 1956.

A reading of Article VI of the AEC–NIC contract makes clear that the premiums paid by REECo and other AEC contractors at the Test Site did not purchase insurance for workman's compensation coverage for employees for AEC's contractors for radiation-caused diseases as the result of exposure to nuclear materials.

■ The effect of Article VI is that REECo has not been, and still is not being, charged by the NIC for insurance covering radiation-induced occupational diseases contracted by its employees. Since REECo has

not been paying for such insurance, it follows that REECo's coverage, as evidenced by its Worker's Compensation Insurance Certificate, is only for nonradiation diseases. As to radiation-induced occupational diseases, REECo is, and at all times material to this case was, an uninsured direct employer of plaintiff. Thus, REECo is not entitled to immunity under NODA from this suit.

Therefore, REECo's motion to dismiss, or in the alternative for summary judgment on the grounds that NODA is plaintiff's exclusive remedy, must be and hereby is denied with prejudice against REECo.

**C. *The United States Has No NODA Immunity.***

■ Because neither REECo nor the AEC provided NODA coverage for plaintiff's radiation-caused disease, plaintiff may assert his "statutory employee" status offensively against the Government as in *Barker v. Luna*, supra. Thus, he may sue the Government under the FTCA for common law tort.

■ The Government claims that the reimbursement scheme set up by the AEC–NIC contract (Contract AT(29–2)–268) satisfies its obligation under NODA. This contention is without merit because the AEC–NIC contract is void.

First, the NIC had no power to enter into such a contract. In Section 2 of the original NODA, now NRS § 617.160, the NIC was given the responsibility of administering NODA.

Subsequent amendments to NODA and NIIA transferred the NIC's powers and duties to administer both acts into § 616.220 of NIIA.

Although there are no Nevada cases dealing with the authority of the NIC to enter into contracts such as that at issue here, a similar problem arose in 1964. In that year, the NIC asked the Nevada State Attorney General for his opinion as to whether or not NIC was authorized to enter into a cooperative agreement with another Nevada state agency for rehabilitating persons receiving

industrial compensation. In concluding that the NIC did not have such authority, the Attorney General said:

"The Nevada Industrial Act was first enacted in 1913, and, after several amendments, was given its present wording, except for a few minor changes, in 1957. It is administered by a board of three commissioners whose powers and duties are defined in Chapter 616 NRS generally, and particularly, in 616.220 thereof. *A careful reading of these fails to reveal anything that specifically delegates any power of the board or commission to enter into a cooperative agreement with any other state agency for rehabilitation purposes.* It is a general rule that commissions and boards have only such powers as are specifically delegated to them by law or which may be reasonably implied therein.

"Industrial insurance acts are in most jurisdictions, including Nevada, liberally construed. *Industrial Commission v. Adair*, 67 Nev. 259 [217 P.2d 348]; *Industrial Commission v. Peck*, 69 Nev. 1 [239 P.2d 244]. But a rule of liberal construction goes more to the manner or method of exercising a power than it does to its substance. Given the most liberal construction, the rule does not permit the reading into the act of something new and different than what the Legislature saw fit to provide. *We feel that the powers given the Industrial Insurance Board as set forth in the statutes are exclusive.*" (Emphasis provided.) AGO 119 (Oct. 10, 1964).

In response to that opinion, the next Nevada Legislature in 1965 passed NRS § 616.223 which granted the NIC the specific authority to enter into the desired cooperative agreement with the Rehabilitation Division of the Nevada Department of Human Resources.

That persuasive precedent has a clear application to the case at bar. Nowhere has NIC been granted the power to contract with the AEC, nor can any such power be implied from any of the state statutes. Therefore, this Court holds that, as a matter of state law, the NIC could not enter into the AEC–NIC contract without a specific grant of power to do so by the Nevada Legislature. Because there has been no such grant of power, the NIC acted without authority, both when it entered into the original contract and each time the contract was modified. The AEC–NIC contract is void.

The AEC–NIC contract is also void pursuant to NRS § 617.190 as a device having for its purpose the modification of the terms of liability created by NODA. Ever since its original enactment, NODA has required employers to make periodic premium payments into the occupational disease fund. That fund provides the compensation for diseased workers. In exchange for those payments, employers are given immunity from common law actions against them.

Under the AEC–NIC contract, the AEC agreed only on certain conditions to reimburse NIC for the reasonable amount of compensation and medical benefits paid by NIC on account of radiation harm suffered by employees of the AEC's contractors and subcontractors. In addition, the AEC would reimburse NIC for administrative expenses incurred by NIC as a result of claims for radiation harm. No payments were ever made into the occupational disease fund to cover radiation harm to employees of the AEC's contractors and subcontractors. The express purpose of the reimbursement was to avoid the burden of those payments. The AEC and NIC contract states:

"it is considered desirable to limit the AEC's economic burden to the actual expenses incurred and payments made by the NIC under the applicable Nevada Act as a result of radiation harm claimed by such employees."

Section 617.190 of NODA provides:

"Devices waiving liability void.

"1. except as otherwise provided for in this chapter, no contract of employment, insurance, relief benefit, indemnity, or any other device, shall modify, change or waive any liability created by this chapter.

"2. A contract of employment, insurance, relief benefit, indemnity, or other device having for its purpose the waiver or modification of the terms of liability created by this chapter shall be void."

That section has remained virtually the same since it was enacted as § 24 of the original NODA.

The AEC–NIC contract was a blatant attempt by the AEC to avoid the necessity of paying, either directly or indirectly, the premiums its contractors and subcontractors were required to pay under NODA. Thus, the contract was void under § 617.-190(2) and the Government cannot assert its "statutory employer" status defensively.

### D. *The AEC Did Not Voluntarily Elect to Participate in NODA.*

�as Contrary to the Government's position in this case, the AEC, by its agreement with NIC, did not voluntarily accept and agree to be covered by NODA and to participate therein. NRS § 617.200 reads:

"617.200 Employers to provide compensation; relief from liability.

"1. Every employer within the provisions of this chapter, and those employers who shall accept the terms of this chapter and be governed by its provisions, shall provide and secure compensation according to the terms, conditions and provisions of this chapter for any and all occupational diseases sustained by an employee arising out of and in the course of the employment.

"2. In such cases the employer shall be relieved from other liability for recovery of damages or other compensation for such occupational disease, unless by the terms of this chapter otherwise provided."

The AEC–NIC agreement does not constitute an acceptance by the AEC of the terms of NODA; does not constitute an agreement to be governed by NODA; does not provide and secure compensation according to NODA for radiation-caused diseases sustained by employees of AEC contractors arising out of their employment at the Test Site.

### E. *Government not Self-Insurer.*

The Government's final argument is that the AEC was a "self-insurer" and, as such, it was not required to pay any premiums in order to be immune from suit.

Self-insured employers are provided for in NODA § 617.205 which reads:

"1. An employer who is certified as a self-insured employer directly assumes the responsibility for providing compensation due his employees and their beneficiaries under this chapter.

"2. A self-insured employer is not required to pay the contributions required of other employers by NRS 617.310.

"3. The claims of employees and their beneficiaries resulting from occupational diseases while in the employment of self-insured employers must be handled in the manner provided by this chapter, and the self-insured employer is subject to the regulations of the commissioner of insurance with respect thereto.

"4. The security deposited pursuant to NRS 616.291 does not relieve the employer from responsibility for the administration of claims and payment of compensation under this chapter.

"5. A self-insured employer qualifying under the provisions of this chapter must comply with the provisions of NRS 616.-291."

The qualifications for self-insurance are set forth in NIIA § 616.291 as follows:

"1. An employer may qualify as a self-insured employer by establishing to the satisfaction of the commissioner of insurance that the employer has sufficient administrative and financial resources to make certain the prompt payment of all compensation under this chapter or chapter 617 of NRS.

"2. A self-insured employer must, in addition to establishing financial ability to pay, deposit with the commissioner of insurance money, corporate or governmental securities or a surety bond written by any company admitted to transact surety business in this state, or any com-

bination of money, securities or a bond. The first deposit must be in an amount reasonably sufficient to ensure payment of compensation, but in no event may it be less than 105 percent of the employer's expected annual incurred loss of claims, or less than $100,000. In arriving at an amount for the expected annual cost of claims, due consideration must be given to the past and prospective loss and expense experience of the employer within this state, to catastrophe hazards and contingencies and to trends within the state. In arriving at the amount of the deposit required, the commissioner of insurance may consider the nature of the employer's business, the financial ability of the employer to pay compensation and his probable continuity of operation. The deposit must be held by the commissioner of insurance to secure the payment of compensation for injuries and occupational diseases to employees. The deposit may be increased or decreased by the commissioner of insurance in accordance with chapter 681B of NRS and his regulations for loss reserves in casualty insurance.

"3. The commissioner of insurance may allow or require the self-insured employer to submit evidence of excess insurance or reinsurance, written by an insurer authorized to do business in this state, to provide protection against a catastrophic loss. The commission shall consider any excess insurance or reinsurance coverage as a basis for a reduction in the deposit required of an employer."

██ Both of these statutes were enacted in 1979 and, by special provision, they did not become effective until January 1, 1980. Thus, the AEC (now DOE) could not have been a "self-insurer" for NODA purposes until that date, which was too late to be applicable to this case. Furthermore, there is absolutely no evidence in the record indicating that any of the requirements for treatment as a "self-insurer" have been allowed. Those requirements include a certificate from the Nevada Insurance Commissioner and an initial deposit by the Government of at least $100,000. Instead of showing that the requirements have been met, the Government simply relies upon the void AEC–NIC contract. The result is that the Government is not entitled to immunity as a "self-insurer" under § 617.205.

None of the Government's theories for immunity under NODA are valid. Under the facts of this case, a private person who did what the Government did could be sued for negligence at common law.

Therefore, the Government's motion to dismiss pursuant to Rules 12(b)(1) and (6), or in the alternative for summary judgment pursuant to Rule 56(b), on the grounds that plaintiff's exclusive remedy is under NODA, must be and hereby is denied.

## IV.

### REECo'S REMAINING MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

A. *Diversity Jurisdiction.*

██ It is well-settled that although Title 28 U.S.C. § 1445(c) prevents workmen's compensation suits from being removed to federal court if filed by claimants in state courts, such suits may still be filed in federal court pursuant to Title 28 U.S.C. § 1332 if there is diversity of citizenship and the amount in controversy is in excess of $10,-000, exclusive of interest and costs. *Horton v. Liberty Mutual Ins. Co.*, 367 U.S. 348, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961). The amount in controversy clearly exceeds $10,-000. However, there is a dispute as to whether or not there is diversity of citizenship.

Nevada is REECo's principal place of business; thus, it is deemed to be a citizen of Nevada pursuant to § 1332(c). In his complaint, plaintiff states that he is a citizen, resident and domiciliary of Utah. However, in REECo's points and authorities in support of its motions it claims that plaintiff is a citizen of Nevada. In his response to those motions, plaintiff repeats his allegation of Utah citizenship.

■ Neither side has presented any factual support for their respective positions on the question of plaintiff's citizenship. Therefore, there is nothing before this Court upon which it can determine whether or not there is diversity jurisdiction. In these circumstances, REECo's motion to dismiss for want of subject matter jurisdiction on the grounds of lack of diversity must be and hereby is denied. Since want of subject matter jurisdiction may be raised at any time, the denial is necessarily without prejudice, Rule 12(h)(3), FRCP.

### B. *Statute of Limitations.*

Since plaintiff's claim against REECo is based on diversity jurisdiction, this Court must apply the Nevada statute of limitations. The applicable statute is NRS § 11.-190(4)(e), which provides a two-year period for "an action to recover damages for injuries to a person or for the death of a person caused by the wrongful act or neglect of another."

REECo contends inter alia that plaintiff's cause of action arose in either 1963 or 1969 so that the complaint is time-barred. *State Farm Mutual Auto Insurance Co. v. Wharton*, 88 Nev. 183, 495 P.2d 359 (1972), lends ·some support to this position. In that decision, the Nevada Supreme Court said that NRS § 11.190(4)(e) "starts to run from the date the injuries were incurred." 88 Nev. at 186, 495 P.2d at 361.

However, in *Sorenson v. Pavlikowski*, 94 Nev. 440, 581 P.2d 851 (1978), the Nevada court did modify its interpretation of § 11.190(4)(e). *Sorenson* was a legal malpractice case in which the Nevada court said:

"The rule followed in many jurisdictions is that the statute of limitations begins to run from the time of the occurrence of the neglect or omission complained of, based upon the lawyer's breach of his duty to exercise a reasonable degree of skill in conducting his client's business.... We believe that a fairer rule, which we now adopt, has developed in California which will have the effect in most cases of avoiding the pitfall for the unwary." 94 Nev. at 443, 581 P.2d at 853 (citations omitted).

The Nevada court then adopted the California rule that an action for legal malpractice sounding in tort does not occur until the client both sustains damage, and discovers, or should discover, his cause of action.

The *Wharton* case arose out of an automobile accident and the resulting payment of monies under an insurance contract. The injuries were evident immediately after the commission of the underlying tort. In contrast, in *Sorenson*, the client did not suffer injury until years after his attorney failed to incorporate all of the agreed-to terms into the final settlement. The case at bar is more analogous to the *Sorenson* case in that, if plaintiff is correct, he developed multiple myeloma by 1969, the year that it was diagnosed, the result of REECo's negligence in 1961–63, and that it was not until early 1979 that he learned, or reasonably should have discovered, his cause of action, i. e., that he was ill as a result of exposure to radiation at the Test Site between 1961 and 1963. Therefore, it appears that if this case was before the Nevada Supreme Court, that court would follow the more enlightened approach and would hold that plaintiff's cause of action did not accrue until at least his multiple myeloma was diagnosed in 1969, and probably not until he discovered, or should have discovered, his cause of action, which might be in 1979. See *Gleason v. United States*, 458 F.2d 171, 174 (3rd Cir. 1972).

■ A plaintiff who relies upon this "delayed discovery" rule must plead facts justifying delayed accrual of his action. The complaint must allege: (1) the time and manner of discovery, and (2) the circumstances excusing delayed discovery. *Frederick v. Calbio Pharmaceuticals*, 89 Cal. App.3d 49, 152 Cal.Rptr. 292 (1979). See also *Velasquez v. Fibreboard Paper Products Corp.*, 97 Cal.App.3d 881, 159 Cal.Rptr. 113 (1979). There is no question that plaintiff has complied with the first requirement. However, the circumstances that he alleges excused his delayed discovery are questionable. Plaintiff repeatedly stresses that he is a lay person without medical knowledge. Although he has been under

medical care since 1969, he does not reveal herein what his doctors told him during the intervening decade. Plaintiff includes copies of medical treatises published in 1975 that lend support to his theory that radiation-exposure may cause multiple myeloma. Also, plaintiff is silent as to whether or not there was any general public dissemination of warnings about the possible harmful effects of radiation between 1961 and 1978. Finally, plaintiff fails to answer REECo's contention that other Test Site workers had sufficient suspicion of radiation exposure so as to initiate the "Baneberry" suit in the early 1970's.

These conflicting evidentiary matters require that the question of when plaintiff should have discovered his possible cause of action must be determined by the fact finder. *Velasquez v. Fibreboard Paper Products Corp.,* supra. Since genuine issues of material fact are presented and plaintiff has demanded a jury trial, awarding REECo summary judgment on the question of the statute of limitations would be inappropriate. See, e. g., *Nolan v. Johns-Manville Asbestos and Magnesium Co.,* 74 Ill.App.3d 778, 30 Ill.Dec. 307, 392 N.E.2d 1352 (1979).

Therefore, REECo's motion to dismiss or for summary judgment based upon the statute of limitations must be and hereby is denied without prejudice.