PERSHING QUICKSILVER COMPANY, Appellant,
v. HENRY I. THIERS, Respondent.

No. 3397

October 13, 1944.                    152 P. (2d) 432.

384

*Thatcher & Woodburn*, of Reno, for Appellant.

*Oliver C. Custer* and *Royal A. Stewart*, both of Reno, for Respondent.

## OPINION

By the Court, ORR, C. J.:

Respondent was awarded a judgment in the trial court for an injury from mercurial poisoning, alleged to have been contracted while employed by appellant, as the result of the negligence of the appellant in failing to furnish respondent a safe place to work.

After inactivity in their mine and mill for a period of some eleven years, the Pershing Quicksilver Company resumed operations, and during the course of those operations, to-wit: on or about the 14th of January 1942 the said Pershing Quicksilver Company employed Henry I. Thiers, the respondent, to work in its mill. Previous to this employment said Thiers was without experience in working in mines or mills of any kind; he had been, just previous to the time appellant employed him, working on farms and ranches in and

about Lovelock, Nevada. After his employment Thiers was put to work as a mechanic's helper, and followed that sort of work for a period of five days. He then was requested by the superintendent to work on the retort and condenser system in the mill.

The mill building is of corrugated iron construction and is 98 feet long by 48 feet wide. There are four doors on each side of the mill building. These doors consist of two sections five feet wide and nine feet in height. There are twelve windows on each side of the building, which are three feet by six, and which rotate in the center. The windows are manipulated by chains which hang from the windows and which can be pulled by a person standing on the floor of the building. There is a conflict in the testimony as to the length of time during a day these windows and doors were kept open. Appellant's testimony is to the effect that the doors and windows were open practically all the time. Respondent's testimony is to the effect that because of the inclement weather which prevailed during the time Thiers was employed, the doors and windows were closed much of the time.

The operation of the mill in the recovery of quicksilver is substantially as follows:

The ore passes through the crusher to the fine ore bin. From the fine ore bin it passes along a conveyor belt, up an elevator, to the top of the Nichols-Herreschoff furnace. The ore is heated to a temperature of about 1400 degrees Fahrenheit, at which point the cinnabar ore breaks down and mercury is disassociated from it. The mercury gases pass into a system of condensers, which in this particular mill were, at the time Mr. Thiers was employed, connected by redwood pipes. The gases condense in the form of free mercury and soot inside the condenser pipes. The condensers were cleaned daily by removing the cap at the top and inserting a rod with a circular disc on the end; this was moved upon and down the pipe, and the particles

of mercury which had formed and the soot fell into the oven at the base of the condenser. The liquid mercury which is produced runs out the oven door to a drain in the floor and into a condenser beneath. Water is then passed into the condenser system by hose, and soot remaining in the condenser system is washed down to the oven and thence drained into a trough at the base of the condenser. The soot, after being washed and dried, is placed in steel pans inside the oven or retort and heated for a period of eight hours. The fumes from the soot while being heated again pass through the condenser system. After eight hours the pans are removed from the retort and the refuse dumped outside, as waste. Two fans are used to draw gases into the condenser system, while another fan blows on the opposite side into the condenser. This latter fan is fifteen inches, the other two nine inches and eleven inches, respectively, and they discharge into a stack going up through the roof of the building. The pipe into which the suction was drawn was thirty-six to forty-eight inches in diameter. The distance between the suction fan and the floor fan was 380 feet.

Respondent's duties while working in the mill consisted of cleaning down the condenser system, cleaning out the ovens at the bottom of the condensers, hoeing the soot on the hoeing table, loading dry soot in the pans and placing the pans in the retort and unloading the retort, lowering the soot pans into the ovens, and removing them therefrom and dumping the contents.

Respondent worked a shift of eight hours, and had thirty minutes off for lunch. He worked in the mill at this job until about the first week in March 1942. He then began experiencing stiff joints, abdominal cramps, diarrhea, insomnia and dizzy spells. The stiff joints and dizzy spells continued to the 21st of March 1942, and he then began spitting up blood and had a metallic taste in his mouth. Along about the 12th of April 1942 respondent consulted a dentist in Lovelock,

and said dentist treated his gums for mercury poisoning. Two or three days later he consulted a physician in Lovelock, who treated him by giving him injections of sodium thiosulphate. Respondent worked about five days thereafter, three days underground and two days in the mill. After the two days work in the mill the cramps became severe and incapacitated the respondent; he was away from work for three days and was treated by a doctor for mercury poisoning. Mr. Thiers again returned to work at the request of the superintendent of the appellant company, and was put to work sorting ore; but this work severely irritated his gums and he was then reassigned to work underground, and continued in the employ of the company until April 25, 1942. Later respondent consulted a physician in Reno, who diagnosed his illness as chronic mercury poisoning. Mr. Thiers continued to receive treatment from a dentist and from a physician, and lost weight and continued to be troubled with insomnia, nightmares, lame joints and abdominal cramps, and was unable to work steadily or hold steady employment.

Several important questions are involved in this appeal. First: does section 2683, N. C. L., abrogate all common-law remedies between employer and employees who have accepted the terms of the Nevada industrial insurance act? If so, then, says appellant, the lower court was without jurisdiction. Respondent denies our right to consider this question because appellant failed to raise it in the lower court and now seeks to have it considered here, for the first time. Appellant rests his right to raise the question in this court for the first time upon the principle of law that a jurisdictional question may be raised for the first time on appeal. 14 Am. Juris. sec. 191, p. 385. It is well settled that as a general rule a jurisdictional question may be raised at any time. We agree with respondent that this is a tort action and generally district courts have jurisdiction of such actions. However,

appellant contends that the particular class of tort actions to which this case belongs is exclusively within the jurisdiction of the Nevada industrial commission, hence the jurisdictional question is squarely presented and no action of appellant in the trial court could have waived its right to have it determined.

■ Appellant, Pershing Quicksilver Company, carried Nevada industrial insurance. There is no evidence that the respondent, Thiers, ever filed notice of rejection of the provisions of the Nevada industrial insurance act. Thiers is, therefore, conclusively presumed to have elected to take compensation in accordance with the provisions of the Nevada industrial insurance act. We have several sections of said act which require consideration. Section 2680, N. C. L., 1931–1941 Supplement to section 1, reads as follows:

"When, as in this act provided, an employer shall accept the terms of this act and be governed by its provisions, every such employer shall be conclusively presumed to have elected to provide, secure and pay compensation according to the terms, conditions, and provisions of this act for any and all personal injuries by accident sustained by an employee arising out of and in the course of the employment; and in such cases the employer shall be relieved from other liability for recovery of damages or other compensation for such personal injury, unless by the terms of this act otherwise provided."

It will be noted that the above-quoted portion of section 2680 covers personal injuries by accident and provides that the employer shall be relieved from other liability for recovery of damages for such personal injuries.

Section 2683, N. C. L., par. 3(a), provides:

"The rights and remedies provided in this act for an employee on account of an injury shall be exclusive of all other rights and remedies of such employee, or legal representative, dependents or next of kin, at common

law or otherwise, on account of such injury    *    *    *."

Appellant considers section 2683 sufficient in itself, and argues that it means precisely what it says, that is, that in the State of Nevada an employee has no remedy at common law or otherwise against his employer because of an injury suffered in the course of his employment, regardless of the fact that the particular injury may not be compensable under the provisions of the act.   Much stronger evidence than is at hand would be necessary to convince us that the legislature intended to designate certain classes of injury and provide compensation therefor and to designedly deny relief to other workmen suffering from occupational diseases which may work as great a hardship on them and their families and result in as much destitution as would an injury received which is acknowledgedly compensable under the act.   We agree with appellant that industrial insurance and workmen's compensation acts have for their purpose the putting of an end to private controversy and litigation between employer and employee, and also that the statutes do give to a workman what he never had before, namely, the right to compensation for injuries suffered in employment regardless of the negligence of the employer.   But the legislature can only be presumed to have intended this to the extent to which they have legislated.   Our attention is called to the fact that the question of including within the act compensation for industrial diseases has engaged the attention of the legislature of the State of Nevada on different occasions but has failed of enactment because such legislation has not met with the approval of a number of the industrialists of this state. That may very well be, yet it is not indicative of the intention of the legislature to exclude a recovery by one suffering from an industrial disease by taking away the common-law action for damages for injuries inflicted because of the negligence of the employer.   We think that in construing the 1915 industrial insurance

act, sections 2680, 2683, 2704 and 2706, N. C. L. should be read together, and when so read the only injury referred to in the statute is personal injury or accident. In so construing the Nevada industrial insurance act we have not ignored the argument of appellant and authorities cited by it, to the effect that the original industrial insurance act enacted in 1913 (Statutes of Nevada, 1913, p. 137) made no mention of accidental injury. In the amended act of 1915, particularly in sections 2680, 2704 and 2706, the words "injury by accident" are used and compensation is restricted to that class of injuries, and jurisdiction of the industrial commission is restricted to that class of injuries. We cannot subscribe to the idea that the 1915 act, by retaining section 2683 in its original form, thereby expressed an intention to exclude recovery for injuries received and not covered by the act. The amendment of 1915 cannot be said to be only as to isolated and integral sections of the 1913 act. "The readopted sections of an amended law are to be construed with reference to the amended sections thereof." 50 Am. Juris., sec. 441, note 5. See, also: 59 C. J., p. 1093, sec. 645; Sutherland Statutory Construction, 3d ed., vol. 1, sec. 1934, p. 430; Crawford Statutory Construction, secs. 302–303, pp. 616, 617. If an injury is compensable under the act and the employee accepts the provisions of the act, then the employee cannot be permitted a choice in the matter as to whether he will sue at common law or accept compensation under the act. In construing a similar provision of the Workmen's Compensation Act of Colorado, in the case of Cason v. American Brake Shoe & Foundry Co., D. C., 32 F. Supp. 680, at page 682, the court said: Clearly the Legislature in enacting the Workmen's Compensation Law, dealt solely with accidental injuries  *  *  *."

■ There are a number of states having similar provisions to the Nevada law, and while not in the precise language they are so similar we consider them authority

for holding that the Nevada statute does not take away a common-law right of action for injury occasioned by occupational disease. In arriving at this conclusion we have given what we consider due consideration to existing legislation in Nevada and the history of all previous legislation relating thereto. We cite: Echord v. Rush, 124 Kan. 521, 261 P. 820; Clark v. Southern Kraft Corporation, La. App., 200 So. 489; Applequist v. Oliver Iron Mining Co., 209 Minn. 230, 296 N. W. 13; Blittschau v. American Car & Foundry Co., Mo. App., 144 S. W. 2d 196; Jellico Coal Co. v. Adkins, 197 Ky. 684, 247 S. W. 972; Donnelly v. Minneapolis Mfg. Co., 161 Minn. 240, 201 N. W. 305; Boyer v. Crescent Paper Box Factory, 143 La. 368, 78 So. 596; Thomas v. Shippers' Compress & Warehouse Co., La. App., 158 So. 859; Smith v. International High-Speed Steel Co., 98 N. J. L. 574, 120 A. 188; Downing v. Oxweld Acetylene Co., 112 N. J. L. 25, 169 A. 709, affirmed in 113 N. J. L. 399, 174 A. 900; Barrencotto v. Cocker Saw Company, 266 N. Y. 139, 194 N. E. 61; Shinnick v. Clover Farms Company, 169 App. Div. 236, 154 N. Y. S. 423; Trout v. Wickwire Spencer Steel Corp., Sup., 195 N. Y. S. 528; Jones v. Rinehart & Dennis Co., 113 W. Va. 414, 168 S. E. 482; Triff v. National Bronze & Aluminum Foundry Co., 135 Ohio St. 191, 20 N. E. 2d 232, 121 A. L. R. 1131 (in this case the court, after following the decision in Jones v. Rinehart & Dennis Co. for a period of twenty years, reversed itself and decided that a common-law action could be maintained in Ohio by a defendant who had acquired silicosis or pneumoconiosis); Cell v. Yale & Towne Mfg. Co., 281 Mich. 564, 275 N. W. 250; Thomas v. Parker Rust Proof Co., 284 Mich. 260, 279 N. W. 504; Gentry v. Swann Chemical Co., 234 Ala. 313, 174 So. 530; Billo v. Allegheny Steel Co., 328 Pa. 97, 195 A. 110; Covington v. Berkeley Granite Corp., 182 Ga. 235, 184 S. E. 871; Mapes v. Massey-Harris Co., D. C., 19 F. Supp. 667; Clark v. M. W. Leahy Co., 300 Mass. 565, 16 N. E. 2d 57; Dixon

v. Gaso Pump & Burner Mfg. Co., 183 Okl. 249, 80 P. 2d 678; McGehee v. Mepham & Co., 279 Ill. App. 115; Depre v. Pacific Forge Co., 151 Wash. 430, 276 P. 89; Dailey v. Mutual Chemical Co. of America, 125 N. J. L. 465, 16 A. 2d 557; Butler v. Eberstadt, 113 N. J. L. 569. 175 A. 159; Boal v. Electric Storage Battery Co., 3 Cir., 98 F. 2d 815; note in 100 A. L. R. p. 519.

█ As the decisions of sister states constitute evidence of what the common law is (15 C. J. S., Common Law, p. 634, sec. 21), the cases cited supra strongly support a conclusion that a right of action for damages caused by an occupational disease exists at common law and is available in this state to one so affected.

Appellant maintains that the injury sustained by respondent was an accident and not an occupational disease, hence compensation therefor was payable under the industrial insurance act, which is the sole remedy open to the respondent; that under such circumstances the trial court was without jurisdiction of the subject matter before it. The complaint alleges that the injury to respondent was the direct and proximate result of the negligence and careless acts of the appellant: (1) In failing to provide plaintiff with a reasonably safe place to work; (2) in providing a defective ventilating system; (3) in failing to provide masks and respirators; (4) in failing to provide facilities by which mercury mud could be washed from the body of appellee; (5) in permitting the ventilating system and equipment to fall into disrepair; (6) in failing to provide suitable working accommodations; (7) in failing to notify appellee of the dangers of the employment, by posting notices about the mine and mill premises.

Because the complaint alleges that the injury sustained by respondent was due to the negligence of the employer, appellant asserts that the said injury is an accident, and cites a number of cases in support of that contention. Dr. Vernon Cantlon, one of the expert witnesses called by respondent, testified, in part, as follows:

"The summary of my examination was the patient worked at a job which, if his statement is true, gave ample opportunity of mercury poisoning of the chronic type, and there was opportunity of mercury poisoning both by inhalation of the quicksilver vapors through the lungs, and poisoning through the skin by contact."

On the question of whether or not mercury poisoning is an accident, we take the following quotation from 29 A. L. R. 691:

"There seems to be no judicial dissent from the proposition that idiopathic diseases, such as lead and other occupational or industrial poisoning, cannot be regarded as accidents within the meaning of the statutes which provide for compensation to workmen for injuries caused by accident arising out of and in the course of their employment."

See, also: Adams v. Acme White Lead & Color Works, 182 Mich. 157, 148 N. W. 485, L. R. A. 1916A, 283, Ann. Cas. 1916D, 689; Hichens v. Magnus Metal Co., 35 N. J. L. J. 327; Jeffreyes v. Charles H. Sager Co., 198 App. Div. 446, 191 N. Y. S. 354; Trout v. Wickwire Spencer Steel Corp., Sup., 195 N. Y. S. 528; Iwanicki v. State Industrial Accident Comm., 104 Or. 650, 205 P. 990, 29 A. L. R. 682; Scotland v. Canadian Cartridge Co., 59 Can. S. C. 471; Jellico Coal Co. v. Adkins, 197 Ky. 684, 247 S. W. 972.

Our reading of these authorities leads to the conclusion that the term "accident" as it refers to a cause of injury must be traced to an unexpected event and to a definite time, place and cause. The Workmen's Compensation Act of Arizona provides compensation for "personal injuries by accident" arising out of and in course of employment, Rev. Code 1928, sec. 1420, and in the case of Pierce v. Phelps Dodge Corp., 42 Ariz. 436, 26 P. 2d 1017, 1020, the court defines the meaning of the word "accident" as used in their statute and comes to a conclusion which we think we should adopt, viz: "an unexpected or unforeseen event happening suddenly and violently, with or without human fault

and producing at the time objective symptoms of an injury. * * *"

Judge Cardozo, in the case of Connelly v. Hunt Furniture Co., 240 N. Y. 83, 147 N. E. 366, 367, 39 A. L. R. 867, clearly sets out the manner of contracting an occupational disease, as distinguished from an accident; he said:

"Germs may indeed be inhaled through the nose or mouth, or absorbed into the system through normal channels of entry. In such cases their inroads will seldom, if ever, be assignable to a determinate or single act, identified in space or time."

The illness suffered by respondent cannot, from the evidence presented, be said to be assignable to a determinate or single act identified in space or time, but the substance was entering his body during the entire course of his employment.

Other cases holding that the breathing of fumes which results in injury to the health of a party is not an accident are: Martin v. Tubize-Chatillon Corp., 66 Ga. App. 481, 17 S. E. 2d 915; Berkeley Granite Corp. v. Covington, 183 Ga. 801, 190 S. E. 8; Franz v. Schroeder, 184 La. 945, 168 So. 110; Golden v. Lerch Bros., Inc., 211 Minn. 30, 300 N. W. 207; Trout v. Wickwire Spencer Steel Corp., Sup., 195 N. Y. S. 528; Jeffreyes v. Charles H. Sager Co., 198 App. Div. 446, 191 N. Y. S. 354. Many more cases could be cited in support of the proposition that the injury to the respondent was not an accident but an occupational disease; however, we deem it unnecessary to do so. The injury was due to a drop by drop, little by little accumulation of poison in respondent's system over a period of weeks, and the time of employment was not too short to permit it to fall into the definition of an occupational disease. The injury suffered is not referable to a distinct time and place or event. It may well be said that the evidence discloses that the injury suffered by respondent was one commonly incident to the work which he performed.

Such conclusion may be drawn from the statements of fellow workmen who had experience in mills of the kind and character operated by the appellant, to the effect that respondent, unless he was careful, would lose his teeth.

Appellant challenges the sufficiency of the evidence to sustain a finding by the jury of any negligence on the part of appellant. The record in this case is voluminous, and we find therein much evidence in support of and against the allegations of negligence as contained in the complaint. In approaching the consideration of this proposition we must keep in mind the rule that the verdict of the jury will not be disturbed if there is any substantial evidence in the record to sustain it, and a careful consideration of all the evidence leaves us convinced that the verdict of the jury is sustained by much substantial evidence.

Appellant asserts that the evidence in the record is uncontradicted that there were three respirators centrally located in the mill and available for the use of the employees. Mr. Cline, a witness on behalf of the respondent, testified that there were no respirators in the mill at any place that he knew of, and that he never saw any, but that he knew that Mr. Messer, the superintendent, got some respirators along toward summer, which was a little after or before Mr. Thiers left. Mr. Thiers, the respondent, testified that the superintendent gave him a respirator two days before he quit the mill, or, as he stated, two days before he started doctoring, which was on or about April 13. It is also asserted by appellant that respondent had never attempted to find out whether or not respirators were available, even after he had full knowledge of the dangers incident to his employment. We do not think Mr. Thiers at any time had full knowledge of the dangers incident to his employment. The evidence is that he was a farmer and had no previous experience around mines or mills. He testified that he was told by some of the miners that.

he would lose his teeth if he stayed on the job long enough. After receiving such information he asked the superintendent whether or not the job was dangerous, and was told that it was not. The superintendent told him that the information which he had was something that miners always said "in kidding a green man"; that the work which Mr. Thiers was engaged in would not give him anything that a good dose of salts would not cure. Mr. Thiers further testified that the superintendent told him that people worked around mills of that kind for years without any ill effects. Respondent further testified that he placed reliance in the information given him by the superintendent.

On the question of the failure to provide adequate ventilation, the appellant produced as a witness a Mr. McCormick, who inspected the mill in February, 1943, about a year after Mr. Thiers left the employment of appellant. The testimony of Mr. McCormick was to the effect that the condition at that time was almost perfect as far as ventilation was concerned. But this evidence is too remote to have much bearing upon the fact as to whether or not the mill was well ventilated in 1942 during the time the respondent was employed there. As to the question of the doors and windows being kept open, the respondent testified that during the winter months, while he was employed, there was considerable rain and snow, and during such times the doors and windows were closed during a good part of the time. Mr. DeLay, a witness on the part of respondent, denied that there was ample fresh air in the mill building at all times. Reference is made to a test which the appellant had made in February 1943 as to the mercury content per cubic meter of air; but respondent left the employ of appellant on April 18, 1942, and here, again, the testimony is too remote to have any bearing upon the mercury content per cubic meter of air during the time respondent was employed.

Evidence in the record supports the allegation that the Herreschoff furnace was operated without a proper seal and that the appellant was negligent in this respect. Appellant states that the condenser system was under a negative pressure equal to that required to raise 1½ inches of water, and that no leakage could occur while this negative pressure was on. Yet there is testimony of witness DeLay that mercury was leaking from the redwood pipe, and that there was a leakage of vapors and fumes escaping from the Herreschoff furnace during the time that respondent Thiers was employed. And, further, the witness DeLay testified that at times there was a clogging of the fan, which caused a back-pressure and also an escape of vapor, and that this was a usual occurrence. The testimony of respondent Thiers is corroborated by witness Holley Phelps, who testified that the superintendent had informed him that mercuric dust would not harm him. There is testimony that certain holes existed in the redwood pipe, and the testimony of respondent's witnesses is to the effect that mercury vapor did actually escape through these holes, and that such escape was frequent. It was further testified on behalf of respondent that when he opened the door of the furnace vapor escaped and "there was no way in the world to keep the fumes that came out from striking one in the face." There is a denial in the record of the contention of appellant that Mr. Thiers was warned that the operation of opening the retort door was dangerous and that he was instructed to stand back when it was first opened and to turn his head when the hot pans were carried out into the open. The evidence introduced by appellant that the retort used in the mill was of a type customarily employed in quicksilver mills and that the method of sealing the door was one customarily employed in similar mills is controverted; and the testimony that it was not customary to use the double door when the system was under vacuum was contradicted by the testimony of the witness DeLay.

There is an allegation that the retort was operated with only one set of pans. Appellant asserts that this occurred only for five days. The record shows that there was only one set of pans on January 20, 1942, and there is evidence to the effect that on March 21, 1943, the retort was still being operated with one set of pans. The superintendent testified that the single set of pans were never reloaded with soot while red hot, but this evidence is contradicted by respondent Thiers, who testified in relation thereto as follows:

"Q. As a result of their being just one set of pans when you removed the hot soot pans from the furnace, what did you have to do? A. I had to carry them out and empty them immediately and bring them back and put this green or fresh soot in them while they were green or practically red hot." (Record on appeals, page 113.)

There is further evidence that a mercury plant is a dangerous plant, and that when employing one to work therein he should be warned regarding the hazards of mercury. We find in the record evidence that the job which Mr. Thiers had as soot man was the most dangerous job in the mill. Further, the respondent testified that he was required to clean out the bottom of the drain in the troughs at the bottom of the condensers, and this required him to roll up his sleeves and place his hands in the mixture of water and mercury; that he was required to stick his hands into the drain pipe to clean it out; that while working in the quicksilver soot and cleaning out the troughs no protective gloves were furnished, and that he frequently got this mud on his body and skin. The facilities provided the workmen for cleansing their hands before eating lunch were inadequate to afford protection against mercury entering their mouths; cold water running through a hose was the only facility which could be utilized within the time allowed for lunch.

Appellant also maintains that there is no

evidence of a direct causal connection between the negligence of appellant and the injury to respondent. The record amply supports the respondent's contention that mercury vapors were escaping in the plant during the entire period of his employment, and we find no evidence as to any other place the respondent could have contracted the poisoning from which it is conclusively established he was suffering. The only reasonable inference that can be drawn from the testimony is that the poisonous gases and fumes permeating the atmosphere in the mill were the proximate cause of the injury to respondent and is sufficient to supply the causal connection between the employment and the injury. Golden v. Lerch Bros., Inc., 203 Minn. 211, 281 N. W. 249. It was the duty of the appellant to furnish the respondent with a safe place to work. Sec. 4241, N. C. L. 1929. This rule also exists at common law. Kennedy v. Grace & Hyde Co., C. C., 92 F. 116, affirmed in 2 Cir. 99 F. 679.

Judgment affirmed.