# 130 Nev., Advance Opinion 87
## IN THE SUPREME COURT OF THE STATE OF NEVADA

ZURI-KINSHASA MARIA TERRY,
INDIVIDUALLY; MARLENE NUNO,
INDIVIDUALLY; MICHELE COSPER,
INDIVIDUALLY; SELENA DENISE
PELAEZ, INDIVIDUALLY; JESSICA
ANNE MORGAN, INDIVIDUALLY;
AND TINA CHAREST, INDIVIDUALLY,
AND ALL ON BEHALF OF CLASS OF
SIMILARLY SITUATED INDIVIDUALS,
Appellants,
vs.
SAPPHIRE/SAPPHIRE GENTLEMEN'S
CLUB, A BUSINESS ORGANIZATION
FORM UNKNOWN; AND SHAC, LLC,
AN ACTIVE NEVADA DOMESTIC
LIMITED LIABILITY COMPANY D/B/A
SAPPHIRE/SAPPHIRE GENTLEMEN'S
CLUB,
Respondents.

No. 59214

FILED

OCT 30 2014



Appeal from a district court summary judgment holding that appellants were independent contractors and not employees within the meaning of NRS Chapter 608. Eighth Judicial District Court, Clark County; Jerome T. Tao, Judge.

*Reversed and remanded with instructions.*

Christensen Law Offices, LLC, and Thomas Christensen, Las Vegas; Rusing & Lopez and Michael J. Rusing and Sean E. Brearcliffe, Tucson, Arizona; The Law Offices of Robert L. Starr and Robert L. Starr, Woodland Hills, California,
for Appellants.

Greenberg Traurig, LLP, and Mark E. Ferrario and Tami D. Cowden, Las Vegas,
for Respondents.

---

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, PICKERING, J.:

This case presents the question of whether appellants, performers at Sapphire Gentlemen's Club, are Sapphire employees within the meaning of NRS 608.010 and thus entitled to the minimum wages guaranteed by NRS Chapter 608. Because NRS 608.010's definition of employee hinges on NRS 608.011's definition of employer, we must decide the larger issue of when an entity is an employer under NRS 608.011, and in particular whether Sapphire is the performers' employer under that section. Given that the Legislature has long used federal minimum wage laws as a platform for this state's minimum wage scheme, that the statutes in question do not signal any intent to deviate from that course, and that for practical reasons the two schemes should be harmonious in terms of which workers are entitled to protection, we herein adopt the Fair Labor Standards Act's "economic realities" test for employment in the minimum wage context. 29 U.S.C. §§ 201-219 (2012). Under that test, the performers are Sapphire's employees within the meaning of NRS 608.010. We therefore reverse and remand.

Sapphire Gentlemen's Club contracts for semi-nude entertainment with approximately 6,600 performers. Under these contracts, the performers may determine their own schedules (but agree to work a minimum shift length of six hours any day they decide to work unless they advise a Sapphire employee of their early clock-out); set prices for their private performances (provided that they comply with the club's established minimum charge); control the "artistic aspects" of their performances (though the club D.J. chooses the music they dance to, and they must obey club rules as to body positioning and physical contact with customers); and perform at other venues should they wish to. The performers also agree to abide by certain "house rules," including a minimum standard of coverage by their costumes and a minimum heel height; payment of a "house fee," which ranges in amount, any night they work; and performing two dances per shift on the club stage unless they pay an "off-stage" fee.

Sapphire pays no wages to the performers; their income is dependent upon tips and dancing fees paid by Sapphire patrons. In the district court, the performers challenged this practice, claiming that they were "employees" within the meaning of NRS 608.010 and thus guaranteed a minimum wage. The district court applied a five-factor test formerly used to determine employment status under the Nevada Industrial Insurance Act, now codified at NRS Chapters 616A-616D, *see Sims v. Gen. Tel. & Elecs.*, 107 Nev. 516, 528, 815 P.2d 151, 159 (1991), *overruled by Tucker v. Action Equip. & Scaffold Co., Inc.*, 113 Nev. 1349, 951 P.2d 1027 (1997), *overruled by Richards v. Republic Silver State Disposal, Inc.*, 122 Nev. 1213, 148 P.3d 684 (2006), and found that the

 

performers were not "employees" within the meaning of NRS Chapter 608. The district court then granted a motion for summary judgment brought by Sapphire. The performers appeal.

## II.

Only an "employee" is entitled to minimum wages under NRS Chapter 608. NRS 608.250, *superseded in part by constitutional amendment as recognized in Thomas v. Nev. Yellow Cab Corp.*, 130 Nev. ___, 327 P.3d 518 (2014). NRS 608.010 defines employees as "persons in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed." Sapphire argues that the performers had no "contract of hire" and alternatively that the performers were not "in the service of" Sapphire. But these arguments lack merit. First, the signed entertainment agreement, which describes in detail the terms under which Sapphire permits the performers to dance at its facility, is an express contract of hire, despite that therein the parties state that they "intend that the relationship created [by the agreement] will be only that of Sapphire and Entertainer and not any other legal relationship." Particularly where, as here, remedial statutes are in play, a putative employer's self-interested disclaimers of any intent to hire cannot control the realities of an employment relationship. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947); *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979); *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669 (5th Cir. 1968). Thus, Sapphire's protestations that the performers "never intended to be employees," and agreed to be independent contractors are beside the point.

Second, ordinarily one is "in the service of" another where one is "of use" to that person. *See Merriam-Webster's Collegiate Dictionary*

1137 (11th ed. 2007) (defining "serve" and "service"). And given that Sapphire concedes that the performers "are an important part of the business of a gentlemen's club, and moreover, that it is . . . the dancers that patrons come to see," the performers undeniably are "of use" to Sapphire, Sapphire's claims that the performers only "provided services to their own customers at Sapphire's facility" notwithstanding. Thus, whether the performers are "employees" under NRS 608.010 turns on whether Sapphire is their "employer."

As relevant to this appeal, an employer "includes every person having control or custody of any employment, place of employment or any employee." NRS 608.011. One has control where one has the "power to govern the management and policies of a person or entity." *Black's Law Dictionary* 378 (9th ed. 2009); *see also Merriam-Webster's Collegiate Dictionary* 272 (11th ed. 2007) (defining "control" as "power or authority to guide or manage"). Custody is "[t]he care and control of a thing or person for . . . preservation, or security." *Black's, supra*, at 441; *see also Merriam-Webster's, supra*, at 308 (defining "custody" as the "guarding" or "safekeeping" by one with authority). In the abstract, these definitions may sufficiently describe an employment relationship as one where a person has the power to direct the management of or the policies governing a worker, or is to some extent responsible for that worker's preservation and security. But this court is faced with a practical problem; namely, identifying which workers, and specifically whether *these* workers, are entitled to minimum wage protections. And our interpretation of NRS 608.011 must provide a structure that lower courts may also use to assess the realities of various working relationships under the section. Viewed with an eye toward such practical necessities, it is

clear that these definitions are insufficiently precise—a security guard, for example, may be somewhat responsible for the safety of employees in the facility he or she guards and thus fall within the definition of "employer" suggested by the conventional dictionary definition of "custody," but it seems unreasonable to deem such an individual responsible for the wages of his or her coworkers. Thus, the interpretation to which these definitions lead is not tenable. *See Harris Assocs. v. Clark Cnty. Sch. Dist.*, 119 Nev. 638, 642, 81 P.3d 532, 534 (2003) (explaining that this court eschews interpretations that produce unreasonable results).

In 2006, Nevada voters provided a new baseline minimum wage law, Article 15, Section 16 of Nevada's Constitution (the Minimum Wage Amendment), and a definition of "employer" to accompany that platform. This definition does not control the analysis here—the performers do not raise their right to minimum wages under the Minimum Wage Amendment; and though this court has recognized that the text of the Minimum Wage Amendment supplants that of our statutory minimum wage laws to some extent, *see Thomas v. Nev. Yellow Cab Corp.*, 130 Nev. ___, ___, 327 P.3d 518, 522 (2014) (holding that "[t]he text of the Minimum Wage Amendment . . . supersedes and supplants the taxicab driver exception set out in NRS 608.250(2)"), the Department of Labor continues to use the definition of "employer" found in NRS 608.011, not that in the Minimum Wage Amendment. NAC 608.070. Still, because of the overlap between the Minimum Wage Amendment and NRS Chapter 608, the Minimum Wage Amendment's definition of employer could be instructive, were it not equally, if not more, tautological than NRS 608.011— "'[e]mployer' means any . . . entity that may employ individuals." Nev. Const. art. 15, § 16(C). Thus, apart from signaling this state's voters' wish

that more, not fewer, persons would receive minimum wage protections, *see Nev. Yellow Cab Corp.*, 130 Nev. at ___, 327 P.3d at 520-21 (relying on the "broad" definition of employee in the Minimum Wage Amendment to identify the voters' intent to extend minimum wage protections to taxicab drivers), the Minimum Wage Amendment offers little elucidation. So it is that a more concrete interpretative aid—one extrinsic from Nevada's statutory and constitutional minimum wage frameworks—is required.

The performers urge this court to adopt the economic realities test that federal courts use under the federal Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219 (2012), as that interpretive aid. Though the parties argue to the contrary, this court has not yet decided the applicability of this federal test under our minimum wage laws. In *Prieur v. D.C.I. Plasma Center of Nevada, Inc.*, we stated that the existence of an employment relationship was determined by looking to the "economic reality" of said relationship, but we did so only in dicta. 102 Nev. 472, 473, 726 P.2d 1372, 1373 (1986). And, while we later denied that *Prieur* had adopted the economic realities test to resolve minimum wage disputes, we did not reject the test in its entirety. *Boucher v. Shaw*, 124 Nev. 1164, 1170-71 n.27, 196 P.3d 959, 963 n.27 (2008). It must be said that the language of NRS 608.011 and the relevant FLSA provisions differs—the FLSA defines an "employer" as one who suffers or permits another to work. 29 U.S.C. § 203(d) & (g) (2012). But the Legislature has long relied on the federal minimum wage law to lay a foundation of worker protections that this State could build upon, *see* 1965 Nev. Stat., ch. 333, § 2, at 696 (extending Nevada's minimum wage protections to those not covered under the FLSA), and so in many significant respects, Nevada's minimum wage laws and those set federally run parallel. *See, e.g.*, NRS

608.250 (directing the Labor Commissioner to set the minimum wage "in accordance with federal law"); *see also* Hearing on A.B. 219 Before the Assembly Labor & Mgmt. Comm., 58th Leg. (Nev., February 18, 1975) (testimony by Raymond D. Bohart, Federated Employers of Nev.) (acknowledging that the bill in question, which extended Nevada's minimum wage statutory protections to both men and women, was "a duplication of the [FLSA] in many aspects"). Such parallels are part of a larger national pattern of laws that have emerged to deal with common problems in the minimum wage context, and many other states have adopted the economic realities test to determine whether an employment relationship exists under their respective state minimum wage laws. *See, e.g., Campusano v. Lusitano Const. LLC*, 56 A.3d 303, 308 (Md. Ct. Spec. App. 2012); *Cejas Commercial Interiors, Inc. v. Torres-Lizama*, 316 P.3d 389, 394 (Or. Ct. App. 2013); *Commonwealth, Dep't of Labor & Indus., Bureau of Labor Law Compliance v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd*, 859 A.2d 1253 (Pa. 2004); *Anfinson v. FedEx Ground Package Sys., Inc.*, 244 P.3d 32, 40-41 (Wash. Ct. App. 2010), *aff'd*, 281 P.3d 289 (Wash. 2012). Where, as here, a statute that requires this court's interpretation implicates broad questions of public policy, the divergent acts of foreign jurisdictions dealing with similar subject matter may properly inform that interpretation. *See Schimek v. Gibb Truck Rental Agency*, 174 A.2d 641, 643 (N.J. Super. Ct. App. Div. 1961); *cf. Klamath Cnty. v. Laborers Int'l Union of N. Am., Local No. 915*, 534 P.2d 1169, 1172 (Or. Ct. App. 1975) (holding that the National Labor Relations Act was relevant to interpret a differently worded state labor relations statute).

True, this court has signaled its willingness to part ways with the FLSA where the language of Nevada's statutes has so required. *See Dancer I-VII v. Golden Coin, Ltd.*, 124 Nev. 28, 32-34, 176 P.3d 271, 274-75 (2008); *Boucher*, 124 Nev. at 1170-71 n.27, 196 P.3d at 963 n.27. Thus, in *Golden Coin*, this court held that Nevada law excluded tips from the calculation of an employee's minimum wages—contrary to the rule under the FLSA—because the language of the relevant statutes was entirely conflicting. 124 Nev. at 32-33, 176 P.3d at 274-75; *compare* 29 U.S.C. § 203(m) (2012) (stating that the minimum wage calculation includes "the cash wage paid" plus "the tips received"), *with* NRS 608.160(1)(b) (making it "unlawful for any person to . . . [a]pply as a credit toward the payment of the statutory minimum hourly wage . . . any tips or gratuities bestowed upon the employees of that person"). And in *Boucher* we determined that the language of NRS 608.011 was not intended to "pierce the corporate veil and extend personal liability to individual managers" for unpaid minimum wages because the Legislature had specifically excluded all references to "manager[s]." 124 Nev. at 1170, 196 P.3d at 963. Again, the FLSA's rule runs contrary, but the relevant statutory language expressly states that "any person acting directly or indirectly in the interest of an employer in relation to an employee" can also be held liable for back wages. 29 U.S.C. § 203(d), 206 (2012). Here, and in contrast to the circumstances of *Golden Coin* and *Boucher*, given the breadth of NRS 608.011's definition and the lack of direction it provides, we cannot say that there is any language in NRS 608.011 so "materially different" from that of 29 U.S.C. § 203(d) and (g) that it would caution this court against adopting the economic realities test to interpret the former. *See Rivera v.*

*Peri & Sons Farms, Inc.*, 735 F.3d 892, 900 (9th Cir. 2013), *cert. denied*, 573 U.S. ___, 134 S. Ct. 2819 (2014).

Moreover, it seems that our Legislature intended that NRS 608.011 would encompass as many or more entities as the FLSA definition, *see* Hearing on A.B. 219 Before the Assembly Labor & Mgmt. Comm., 58th Leg. (Nev., February 20, 1975) (testimony by Stan Jones, Nev. State Labor Comm'r) (explaining that the bill that added the definition was necessary because "there are many workers in Nevada that the people in Washington have forgotten"), and to avoid preemption, our state's minimum wage laws may only be equal to or more protective than the FLSA. *See* 29 U.S.C. § 218 (1967); *Golden Coin*, 124 Nev. at 32-33, 176 P.3d at 274-75. In accordance with the FLSA's remedial purpose, 29 U.S.C. § 203(d) and (g) are necessarily broad, *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003); indeed, it has been said that "a broader or more comprehensive coverage of employees [than that provided in the FLSA's definitions] would be difficult to frame." *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945) (internal quotations omitted). And, recognizing that "a constricted interpretation of the phrasing by the courts would not comport with [such a] purpose," the Supreme Court has indicated that it fashioned the economic realities test to be wide-reaching. *Cf. United States v. Silk*, 331 U.S. 704, 711-12 (1947), *superseded by statute as recognized in Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir. 1983). Thus, the economic realities test examines the *totality of the circumstances* and determines whether, as a matter of economic reality, workers depend upon the business to which they render service for the opportunity to work. *See Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 32-33 (1961); *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431,

434 (5th Cir. 2013). Given this backdrop, this court has difficulty fathoming a test that would encompass more workers than the economic realities test, short of deciding that all who render service to an industry would qualify, a result that NRS Chapter 608 and our case law specifically negate. *See* NRS 608.255; *Prieur*, 102 Nev. at 474, 726 P.2d at 1373.

Thus, to the extent that our test could only, from a pragmatic standpoint, seek to be equally as protective as the economic realities test, and having no substantive reason to break with the federal courts on this issue, "judicial efficiency implores us to use the same test as the federal courts" under the FLSA. *See Moore v. Labor & Indus. Review Comm'n*, 499 N.W.2d 288, 292 (Wis. Ct. App. 1993) (adopting, for analogous state law purposes, the test used by federal courts to determine whether someone is an employee for the purpose of a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (2012)). That the Legislature repeatedly heard testimony as to the burden on businesses and potential confusion should Nevada's Minimum Wage Act and the FLSA fail to operate harmoniously—*see, e.g.*, Hearing on A.B. 219 Before the Assembly Labor & Mgmt. Comm., 58th Leg. (Nev., February 24, 1975) (testimony by Stan Warren, Nev. Bell) (discussing his concern that if the FLSA and Nevada's Minimum Wage Act were inharmonious it would "increase their operation costs and bring about inefficiency" because "they would have to keep two sets of books"); *id.* (testimony by Louis Bergevin, Nevada Cattlemen's Association) (suggesting that the bills in question "be amended to read as the FLSA reads" for clarity)—and that it responded to these concerns by amending the bill in question—1975 Nev. Stat., ch. 353, § 1, at 500-01 (clarifying the protections to which employees that fell under the FLSA were entitled)—reflects and further illuminates this

administrative need, and further supports our adoption of the federal standard in this instance.

Inasmuch as the Legislature borrowed the language of NRS 608.010 from Nevada's workers' compensation statute, NRS 616A.105, see A.B. 48, 72d Leg. (Nev. 2003), the district court's adoption of the test formerly applied to NRS 616A.105 under NRS Chapter 608 was somewhat logical. But NRS Chapter 608 and the Nevada Industrial Insurance Act (NIIA) are not *in pari materia* because the underlying purpose of this state's workers' compensation laws—to wit, to limit "private controversy and litigation between employer and employee" and to give workers the right to compensation regardless of fault, *Pershing Quicksilver Co. v. Thiers*, 62 Nev. 382, 389, 152 P.2d 432, 436 (1944)—is distinct from that of the statutory minimum wage scheme, which seeks to safeguard the "health and welfare of persons required to earn their livings by their own endeavors." *See* NRS 608.005. And, while labor and employment laws that effectuate different goals "should not be entirely discounted, we must remain cognizant that they were not enacted for precisely the same purpose as the Minimum Wage Act."[1] *Stuber*, 822 A.2d at 872-73. With this in mind, other states utilize different tests for employment under their respective minimum wage and workers' compensation schemes. *Compare id.* (adopting the economic realities test to determine employment under Pennsylvania's minimum wage act), *with Southland Cable Co. v. W.C.A.B. (Emmett)*, 598 A.2d 329, 330-31 (Pa. Commw. Ct.

---

[1]Thus, Sapphire's advancement of the *Meers v. Haughton Elevator*, 101 Nev. 283, 701 P.2d 1006 (1985), "normal work" test—the test for employment under this state's *current* workers' compensation statutes—is likewise unavailing.

1991) (adopting the common-law control test to determine employment under Pennsylvania's workers' compensation act); *also compare Campusano*, 56 A.3d at 308 (adopting the economic realities test to determine employment under Maryland's minimum wage act), *with Mackall v. Zayre Corp.*, 443 A.2d 98, 103 (Md. Ct. App. 1982) (reiterating that the control test is used to determine employment under Maryland's workers' compensation act); *also compare Cejas*, 316 P.3d at 394 (adopting the economic realities test to determine employment under Oregon's minimum wage act), *with Dep't of Consumer & Bus. Servs. v. Clements*, 246 P.3d 62, 66-67 (Or. Ct. App. 2010) (applying a control-based test to determine employment under Oregon's workers' compensation act); *also compare Anfinson*, 244 P.3d at 40-41 (adopting the economic realities test to determine employment under Washington's minimum wage act), *with D'Amico v. Conguista*, 167 P.2d 157, 160 (Wash. 1946) (applying the common-law control test to determine employment under Washington's workers' compensation act).

Moreover, prior to 2003, NRS 608.010's definition of employee did not track that found in the workers' compensation statutes. *See* 2003 Nev. Stat., ch. 291, § 2, at 1518. It appears that the Legislature imported NRS 616A.105's language to the statutory minimum wage context solely because NRS 616A.105 had been read to encompass all workers regardless of immigration status, *Tarango v. State Indus. Ins. Sys.*, 117 Nev. 444, 448, 25 P.3d 175, 178 (2001), and the Legislature sought to revise the minimum wage statutes to also protect "persons unlawfully employed." *See* Hearing on A.B. 48 Before the Assembly Commerce & Labor Comm., 72d Leg. (Nev., Feb. 26, 2003). Thus, the Legislature did not have in mind any additional interpretive gloss that this court previously gave NRS

SUPREME COURT
OF
NEVADA

(O) 1947A

13

616A.105 or its predecessor, NRS 616.055. So, even setting the disparate purposes of NRS Chapter 608 and NIIA aside, there is no justification for deeming this specific post-enactment amendment to control NRS 608.010's meaning, so as to construe the sections harmoniously, as this court might otherwise be inclined to do. *See* 2B Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 51:2 (7th ed. 2012) (noting that courts "assume that a legislature always has in mind previous statutes relating to the same subject when it enacts a new provision").

Thus, the Legislature has not clearly signaled its intent that Nevada's minimum wage scheme should deviate from the federally set course, and for the practical reasons examined above, our state's and federal minimum wage laws should be harmonious in terms of which workers qualify as employees under them. We therefore adopt the FLSA's "economic realities" test for employment in the context of Nevada's minimum wage laws.

### III.

While it is not necessary to list exhaustively every factor that could be relevant in the totality of circumstances that make up a working relationship's economic reality, there are some factors which courts nearly universally consider:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
>
> 4) whether the service rendered requires a special skill;

> 5) the degree of permanence of the working relationship; and
>
> 6) whether the service rendered is an integral part of the alleged employer's business.

*Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979); *see also* Deborah T. Landis, Annotation, *Determination of "Independent Contractor" and "Employee" Status for Purposes of § 3(e)(1) of the Fair Labor Standards Act (29 U.S.C.S. § 203(e)(1))*, 51 A.L.R. Fed. 702 § 2 (1981) (collecting cases). With this in mind, we examine the district court's summary judgment regarding the performers' relationship with Sapphire de novo, *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005), and because the material facts in this case are undisputed, we decide whether an employment relationship exists between them as a matter of law. *See Randolph v. Budget Rent-A-Car*, 97 F.3d 319, 325 (9th Cir. 1996); *cf. Schlotfeldt v. Charter Hosp. of Las Vegas*, 112 Nev. 42, 47, 910 P.2d 271, 274 (1996) (suggesting that the question of whether an agency relationship exists may be a question of law where no material facts are disputed).

As to the "control" factor considered under the totality of the circumstances, at first look, the facts may appear mixed. Sapphire did not produce a set schedule for performers, theoretically allowing them to work any day they wished for as long as they wished, provided that they met a six-hour shift minimum or received permission to depart early. Additionally, though the club set a two stage-dance minimum for performers not paying the off-stage fee, and discouraged performers from refusing to give a lap dance if a customer requested one, the decision of whether or not to stage dance ultimately lay in the discretion of the performers, as did their acceptance or rejection of a patron's invitation for

a private dance. And, while Sapphire required performers to accept "dance dollars"—from which the club took a cut—whether or not they preferred to, performers were also permitted to accept cash, to which the club laid no claim.

But this court is mindful that Sapphire's supposed lack of control may actually reflect "a framework of false autonomy" that gives performers "a coercive 'choice' between accruing debt to the club or redrawing personal boundaries of consent and bodily integrity." Sheerine Alemzadeh, *Baring Inequality: Revisiting the Legalization Debate Through the Lens of Strippers' Rights*, 19 Mich. J. Gender & L. 339, 347 (2013). Put differently, Sapphire emphasizes that performers may "choose[ ] not to dance on stage at Sapphire" so long as they also "choose to pay an optional 'off-stage fee,'" and similarly that a performer may "choose[ ] not to dance for a patron she knows will pay with dance dollars, she may make that choice," though the performer may not ask that patron to pay in cash, and in making either choice the performers also risk taking a net loss for their shift. But by forcing them to make such "choices," Sapphire is actually able to "heavily monitor [the performers], including dictating their appearance, interactions with customers, work schedules and minute to minute movements when working," while ostensibly ceding control to them. *Id.* at 342 n.12. This reality undermines Sapphire's characterization of the "choices" it offers performers and the freedom it suggests that these choices allow them; the performers are, for all practical purposes, "not on a pedestal, but in a cage." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973).

Added to this is the weight of other economic realities factors. *See Real*, 603 F.2d at 754. First, given that the performers risked little

more than their daily house fees, personal grooming expenditures, costume costs, and time, and that the one who "takes the risks . . . reaps the returns," their opportunity for profit was limited accordingly. *See Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1351-52 (M.D. Fla. 1997). That a performer might increase her profits through "hustling," that is using her interpersonal skills to solicit larger tips, is not dispositive—"[a]s is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service . . . ." *Id.* at 1352; *see also Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1345-46 (N.D. Ga. 2011).

With regard to the relative investment of the parties, we note that Sapphire provides all the risk capital, funds advertising, and covers facility expenses. The performers' financial contributions are limited to those noted above—their costume and appearance-related expenses and house fees. Thus, the performers are "far more closely akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments," *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 328 (5th Cir. 1993) (internal quotation omitted); *see also Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 920 (S.D.N.Y. 2013); *Clincy*, 808 F. Supp. 2d at 1347; *Harrell*, 992 F. Supp. at 1350; *Reich v. Priba Corp.*, 890 F. Supp. 586, 593 (N.D. Tex. 1995); *Jeffcoat v. State, Dep't of Labor*, 732 P.2d 1073, 1077 (Alaska 1987), and this factor also weighs in the performers' favor.

All work requires some skill, so in the economic realities context, courts look specifically for workers' "special" skills; namely, whether their work requires the initiative demonstrated by one in

business for himself or herself. *See Circle C.*, 998 F.2d at 328. Sapphire suggests that the performers' ability to "hustle" clients is one such skill. But inasmuch as Sapphire does not appear to have interviewed the performers for any indication of their hustling prowess, it is not apparent that their work actually requires such initiative. In any case, though it may well be that a good "hustle" is a considerable boon in the field, "the ability to develop and maintain rapport with customers is not the type of 'initiative' contemplated by this factor." *Id.*

According to Sapphire, "[d]ancers are itinerant *because* they have the freedom to ply their dancing trade at a multitude of gentlemen's clubs," and so the factor looking to the permanency of the relationship should weigh in its favor. True, Sapphire allowed the performers to work at other venues, and different performers testified that they continued schooling or other employment during their tenure at Sapphire. But, that the performers "were free to work at other clubs or in other lines of work . . . do[es] not distinguish them from countless workers in other areas of endeavor who are undeniably employees . . . for example, waiters, ushers, and bartenders." *Rick's Cabaret*, 967 F. Supp. 2d at 921. The ultimate inquiry is the nature of the performers' dependence on the club, and "[e]ven if the freedom to work for multiple employers may provide something of a safety net, unless a worker possesses specialized and widely-demanded skills, that freedom is hardly the same as true economic independence." *McLaughlin v. Seafood, Inc.*, 861 F.2d 450, 452-53 (5th Cir. 1988), *modified on other grounds*, 867 F.2d 875 (5th Cir. 1989). Thus, though the temporary nature of the relationship at issue weighs against it being that of employer/employee, this factor carries little persuasive value in the context of topless dancers and the clubs at which they perform, and

cannot alone tilt the scales in Sapphire's favor. *See Priba Corp.*, 890 F. Supp. at 593-94.

Sapphire contends that "[e]xotic dancing is customarily performed by independent contractors, and therefore, is not an integral part of Sapphire's business." Quoting *Meers v. Haughton Elevator*, 101 Nev. 283, 286, 701 P.2d 1006, 1007 (1985), Sapphire argues that "the test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business[,] . . . [t]he test . . . is whether that indispensable activity is, in that business, normally carried on through employees rather than independent contractors." Even assuming it is true that "exotic dancing" is typically performed by independent contractors—a tenuous proposition given that most foreign precedent demonstrates it is performed by *employees, see, e.g., Circle C.*, 998 F.2d at 330 (holding that exotic dancers were employees not independent contractors); *Rick's Cabaret*, 967 F. Supp. 2d at 925-26 (accord); *Clincy*, 808 F. Supp. 2d at 1350 (accord); *Thompson v. Linda & A.*, 779 F. Supp. 2d 139, 151 (D.D.C. 2011) (accord); *Harrell*, 992 F. Supp. at 1354 (accord); *Priba Corp.*, 890 F. Supp. at 594 (accord); *Jeffcoat*, 732 P.2d at 1078 (accord)—Sapphire cites no authority supporting the application of the *Meers* "normal work" test to this factor in the economic realities context. And to do so simply makes no sense; if we are examining whether work is "integral" to an employer's business, the test *must be* whether it is "useful, necessary, or even absolutely indispensable" to the business. *See Merriam-Webster's Collegiate Dictionary* 650 (11th ed. 2007) (defining "integral" as "essential to completeness"). Given that Sapphire bills itself as the "World's Largest Strip Club," and not, say, a sports bar or night club, we are confident that

SUPREME COURT
OF
NEVADA

(O) 1947A

19

the women strip-dancing there are useful and indeed necessary to its operation. *See Linda & A.,* 779 F. Supp. 2d at 150 (calling it a "self-evident conclusion that nude dancers formed an integral part of [the strip club's] business").

Thus, based on our review of the totality of the circumstances of the working relationship's economic reality, Sapphire qualifies as an employer under NRS 608.011, and the performers therefore qualify as employees under NRS 608.010. In so holding, this court is in accord with the great weight of authority, which has almost "without exception . . . found an employment relationship and required . . . nightclub[s] to pay [their] dancers a minimum wage." *See Clincy,* 808 F. Supp. 2d at 1343 (internal quotation omitted) (collecting cases). We therefore reverse the district court's grant of summary judgment in favor of Sapphire and remand for further proceedings consistent with this opinion.

_____, J.
Pickering

We concur:

_____, C.J.
Gibbons

_____, J.
Parraguirre

_____, J.
Cherry

_____, J.
Hardesty

_____, J.
Douglas

_____, J.
Saitta

